**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,**

v.

**W. Michael SHINKLE, Respondent.**

No. 05–0151.

Supreme Court of Iowa.

June 24, 2005.

Charles L. Harrington and David J. Grace, Des Moines, for complainant.

W. Michael Shinkle, Kansas City, Mo., pro se.

LAVORATO, Chief Justice.

Ten years after the alleged ethical violations, Willie T. Lard, Jr. filed a complaint against attorney W. Michael Shinkle in connection with a workers' compensation case in which Shinkle had represented Lard. Almost three years passed before the Iowa Supreme Court Board of Professional Ethics and Conduct filed its complaint against Shinkle based on Lard's complaint. Those charges included neglect, misrepresentation, and advancing money to Lard during Shinkle's representation of him. The Grievance Commission found that the Board had proven only the latter charge and recommended a public reprimand. We agree with the Commission's finding and recommendation.

## I. The Complaint.

The Board alleged the following. First, Shinkle failed to file in a timely manner a claim for compensation for Lard, which constituted neglect of a client's legal mat-

ter. Second, Shinkle concealed his neglect and misrepresented the status of this matter to Lard. Last, Shinkle paid Lard money at various times to placate Lard, hoping that the case would "just go away." These actions were in violation of DR 6–101(A)(3) (lawyer shall not neglect a client's legal matter), DR 7–101(A) (lawyer shall not fail to seek the lawful objectives of a client, fail to carry out an employment contract, or prejudice or damage a client), DR 1–102(A)(4) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), and DR 5–103(B) (lawyer shall not advance financial assistance to a client while representing the client in connection with contemplated or pending litigation). These actions were also in violation of DR 1–102(A)(1) (lawyer shall not violate a disciplinary rule), (5) (lawyer shall not engage in conduct that is prejudicial to the administration of justice), and (6) (lawyer shall not engage in any other conduct that adversely reflects on the fitness to practice law).

## II. Scope of Review.

■ Shinkle has not appealed under Iowa Court Rule 35.11. Nevertheless, we review the record de novo. Iowa Ct. R. 35.10(1). Although we give respectful consideration to the Commission's recommendation, we ultimately decide what discipline is appropriate under the unique facts of each case. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wickey,* 679 N.W.2d 1, 2 (Iowa 2004). This means we may impose a lesser or greater sanction than the discipline the Commission recommends. *Id.;* Iowa Ct. R. 35.10(1).

■ The Board has the burden to prove its allegations of lawyer misconduct by a convincing preponderance of the evidence. *Id.* "This burden of proof is greater than that in a civil case but less than that in a criminal case." *Iowa Supreme*

*Ct. Bd. of Prof'l Ethics & Conduct v. Lesyshen,* 585 N.W.2d 281, 283 (Iowa 1998).

## III. Facts

In our review of the record we are hampered, as was the Commission, by the undue delay as described above. In the intervening years, Shinkle lost much of the documentation relating to Lard's case because of several office moves, office flooding on multiple occasions, and Shinkle's failure to preserve computer information regarding the case. However, several important documents that are critical to Shinkle's defense were available because Lard had retained them. Additionally, Shinkle was able to find some office notes, medical information, and letters pertaining to this matter.

Lard, Deborah Lard, and Shinkle testified at the disciplinary hearing. Deborah Lard is Lard's wife from whom he was separated at the time of the hearing. While reviewing the record, we noted many inconsistencies in the testimony of Lard and Deborah, not only in connection with the documentation that was available but also between themselves. In contrast, Shinkle's testimony was substantially consistent with that documentation. We therefore give his testimony considerably more weight.

Based on the documentation that was available and testimony from Lard, Deborah, and Shinkle, we find the following facts.

Following his graduation from law school in 1970, Shinkle practiced law in Des Moines as a securities lawyer. Later he became a trial lawyer, handling various types of litigation, including securities litigation. His office was in Davenport where he was associated with several law firms. Beginning in the mid–1980s, Shinkle became a solo practitioner until March 2000 when he joined a Kansas City law firm.

Since the mid–1980s, Shinkle's practice has been limited mostly to defending an odorant manufacturer in explosion cases.

Shinkle first represented Lard in the late 1970s in a discrimination case against Lard's union. On November 30, 1989, Lard had his first meeting with Shinkle regarding the matter that ultimately gave rise to this disciplinary hearing. Shinkle produced some handwritten office notes that confirm this.

At the time he met with Shinkle, Lard had been recovering from injuries he received fourteen months earlier on September 7, 1988, while working on a barge on the Mississippi River for his employer, J.F. Brennan Co. Lard fell and injured his back. Lard had been receiving workers' compensation benefits under the Longshoremen's and Harbor Workers' Compensation Act and had received approximately $32,000 in benefits when he visited with Shinkle about the case. Before this time, Lard had been dealing on his own with his employer's insurance carrier, Wausau Insurance Companies.

On September 11, 1989, Lard, at the request of the carrier, was seen by Dr. Patrick W. Hitchon at the University of Iowa Hospitals and Clinics. Dr. Hitchon told Lard that he should either undergo a myelogram and CT or go back to work. In October Lard underwent the recommended studies. A letter from Dr. Hitchon, dated December 5, 1989, is in evidence and states what the doctor told Lard in October: If Lard believes his pain is incapacitating, surgery would be offered; if Lard decides against surgery, he should return to work at the earliest opportunity. Lard told Shinkle what the doctor had said; however, Lard said he was fearful of any surgical procedure and would not agree to undergo surgery.

On December 23, 1989, Shinkle received a letter dated December 18, 1989, from the employer's carrier. The carrier stated that it had been informed by a rehabilitation specialist that Lard had retained Shinkle. The carrier also stated that it had information from the University of Iowa Hospitals and Clinics concerning Lard's option of having surgery or returning to work immediately. Apparently, the carrier had information that Lard did not want surgery in which event, the carrier stated, no further compensation benefits were owed because Lard was capable of returning to work. The carrier further stated it was filing form LS–207, Notice of Controversion, with the U.S. Department of Labor in Chicago, in which it would controvert Lard's right to continuing compensation.

As a result of the December 18 letter, Lard, Deborah, and Shinkle met on several occasions sometime in December or early January to discuss Lard's potential back surgery. After considerable pressure from Deborah and Shinkle, Lard reluctantly agreed to the surgery, which occurred on January 17, 1990. Meanwhile, on December 21, 1989, the carrier filed the form LS–207 and sent a copy only to Lard. Shinkle did not become aware of this filing until some time later when Lard gave him a copy of the form.

On December 28, 1989, the carrier sent out a form captioned "Notice of Final Payment or Suspension of Compensation Payments" to Lard. Again, the notice was sent only to Lard. The form indicated that Lard had received compensation of $32,029.37 and that he had one year to file a claim from the date of last payment. Shinkle was not aware of this letter either until some time later when Lard gave him a copy.

On February 7, 1990, the United States Department of Labor wrote Lard inviting him to respond to his employer's objection

to payment of any further compensation benefits to him. The letter advised Lard that, without a response from him, the employer's controversion would be upheld and the case closed. Although the letter indicates a copy was sent to Shinkle, Shinkle testified he did not receive it and that Lard gave him a copy shortly before March 22, 1990.

Shinkle's receipt of the February 7 letter from Lard prompted Shinkle to respond on March 22, 1990. In that letter, Shinkle informed the Department of Labor that Lard had undergone surgery and for that reason the controversion was moot. Shinkle also informed the Department of Labor that he had not received the February 7 letter, which Lard had recently given him, and asked the agency to send future documents to his full and correct address.

Some time later, Lard told Shinkle that the carrier had resumed paying Lard's compensation benefits. As Lard was receiving compensation benefits, he also was receiving post-surgery rehabilitation treatments to enable him to return to work. Those treatments continued until July 1990. While these disciplinary proceedings were pending, Shinkle discovered documents from the Bettendorf Physical Therapy Center relating to the treatments.

Contrary to Lard's testimony that he wanted to be rehabilitated so he could return to work, those treatment documents belie his testimony. A discharge report dated July 19, 1990 from the Bettendorf Physical Therapy Center stated that Lard was discharged because of lack of progress related to incompatibility of Lard's goal (finding out what is wrong with him) and the program's goal (returning to work), potential secondary gain from remaining dysfunction, and test results indicating Lard was trying to magnify his symptoms. To compound the deceitfulness in his testimony, Lard further testified that he never said these things to the physical therapists that were treating him.

The next significant date is August 6, 1990. On that date Lard's doctor sent a letter to the carrier with a copy to Lard, stating that Lard could return to work without restrictions in September 1990. Significantly, no copy was sent to Shinkle. On August 9 the carrier sent Lard a letter enclosing a copy of the August 6 letter from his doctor and informing Lard that he was released to return to work on September 1, 1990. Again, no copy of this letter was sent to Shinkle. Lard did not provide Shinkle with copies of these letters until much later.

On August 31, 1990, the carrier sent Lard a letter enclosing a check for $129.81, representing temporary total disability payments through August 31, 1990. The letter informed Lard that because his doctor had released him to full employment without restrictions as of September 1, 1990, temporary disability payments have ceased. On the same day—August 31— the carrier sent Lard a notice of final payment or suspension of compensation payments. The notice contained the following language: "Any claim for compensation, to be valid, must be filed IN WRITING with the Deputy Commissioner, OWCP, WITHIN ONE YEAR after the date of injury or date of last payment of compensation." The notice stated that the date of last payment was August 31, 1990 and that Lard had been paid a total of $46,582.81 in benefits. Neither the August 31 letter nor the August 31 notice of final payment indicates that Shinkle was sent a copy.

On October 26, 1990, the carrier wrote Lard a letter informing him that it would no longer pay for any more prescription refills. That prompted Lard to seek Shinkle's help in that regard. In the course of

their discussions, Lard provided Shinkle with the August 6 letter from the doctor stating that Lard could return to work and the August 31 letter from the carrier stating Lard could return to work without restrictions on September 1, 1990.

During the course of this conversation with Lard, Shinkle asked Lard if he had gotten a LS–207 form or notice of final payment or follow-up letter from the Labor Department as he had in December 1989 and February 1990. Lard denied receiving any such forms, notices, or follow-up letters. What Lard had neglected to tell Shinkle was that he indeed had received a notice of final payment from the carrier on August 31, 1990, which informed Lard that he had one year from August 31, 1990 to file a claim. Lard and Shinkle disagree on whether Lard gave that critical notice to Shinkle at that meeting. Lard claims he did; Shinkle claims he did not.

Thereafter, Shinkle performed a number of services for Lard that are consistent with Shinkle's claim that Lard had not given him the August 31, 1990 notice of final payment. For example, in March 1991, Shinkle wrote a letter to the Bettendorf Physical Therapy Center concerning scheduling Lard for further evaluation because Lard was complaining of pain and because of that pain Lard had not gone back to work.

On May 10, 1991, Shinkle wrote to Lard's local union, stating that he represented Lard and that if Lard was incapable of working or capable of only light duty work, he would like to see Lard's workers' compensation benefits restarted. On the same day, Shinkle wrote to Dr. Richard L. Kreiter, asking him to evaluate Lard and give an opinion as to Lard's physical status.

On May 26, 1991, Shinkle wrote to Dr. Eugene Collins. In that letter Shinkle stated that Dr. Kreiter had given Shinkle his name and requested Dr. Collins to evaluate Lard. In a letter dated July 2 from Dr. Collins to Shinkle, Dr. Collins agreed to consider further testing after reviewing all of Lard's records. On the same day, Shinkle wrote a hand-delivered letter to Dr. Collins enclosing payment for an initial interview and history of Lard. Shinkle said he was in the process of obtaining copies of all of Lard's medical records and would send them to Dr. Collins.

August 31, 1991 was the last date for Lard to file a claim contesting the cessation of compensation benefits. Nothing was filed.

On September 16, 1991, Shinkle wrote a hand-delivered letter to Dr. Collins which included medical records from the University of Iowa Hospitals and Clinics.

On September 30, 1991, Lard underwent a cervical myelogram that revealed an "old interbody fusion of C5 with 6" and a "fairly large extradural defect on the nerve root sleeve at the C6–7 level on the left side. This could be due to a herniated disc and/or a hypertrophic spur." On October 4 Dr. Collins wrote to Shinkle opining that Lard's current problem was due to the original accident and that additional surgery was recommended. The words "additional surgery" in the letter are circled and a line was drawn to a handwritten note, initialed by Shinkle, that says, "Told Willie—He says _no_."

Notes from a meeting with the Lards on April 4, 1992 say, "Second Surgery?—'No way' ... Said no 2d surgery—no go."

Lard did not undergo a second surgery and has never gone back to work. Lard has only worked odd jobs since his injury on the barge. At the time of the disciplinary hearing, Lard was unemployed. He testified that he never heard that Dr. Collins said he needed a second surgery.

Lard denied any discussion between him, Deborah, and Shinkle, and his former doctor regarding a second surgery. Deborah and Shinkle testified that the three of them indeed had discussed Lard's need for a second surgery.

Shinkle testified he believed that a second surgery would rectify Lard's back problems and that the carrier would insist on the surgery before it would agree to recommence any compensation benefits. For these reasons, he and Deborah persisted in their efforts to convince Lard to have the surgery.

In the fall of 1993, Lard told Shinkle that he had changed his mind and would have the second surgery. Shortly, thereafter, Shinkle prepared a draft claim for compensation that he intended to file with the Labor Department. This draft states in part:

> In view of the [foregoing], and in view of the fact that Employee did not receive either a Notice of Final Payment or Notice of Controversion of Right to Compensation, Employee respectfully requests that disability payments in the sum of $454.15 per week be paid to him and that he receive back payments of an amount sufficient to compensate him for [a] reasonable period of time that he should have been receiving said weekly disability payments.

When Shinkle met with Lard to discuss the draft, Lard, for the first time, told Shinkle that he had found an envelope he had received from the carrier that he had not opened until shortly before the meeting. That was the first time that Shinkle saw the notice of final payment or suspension of compensation payments dated August 31, 1990. During that discussion, Shinkle told Lard that nothing could be done because the one-year period had run.

Notwithstanding the fact that Lard received over $46,000 in compensation benefits, the only compensation Shinkle received from Lard for his services in this matter was $500. Shinkle's trust account ledger shows that he received a $500 retainer from Lard on October 11, 1990. Although Lard claims he had a contingent fee contract, Shinkle testified there was no such agreement. Other than Lard's testimony, there is no proof that such an agreement was reached. The trust account ledger showing a retainer for $500 is the only written evidence on this point. This evidence supports Shinkle's testimony.

Shinkle admits from time to time he gave money to Lard, Deborah, and their daughter in response to specific requests from them during the representation and after the representation ended. From November 1989 until October 1993—the time during which Shinkle represented Lard—he wrote checks to Lard totaling $1750.

Both Lard and Deborah testified that Shinkle was advancing the funds and that Shinkle would get the money back when he settled the case. The money, they said, was used to help pay bills because Lard was out of work. There is no written evidence to support the Lards' claim that Shinkle would get the money back when he settled the case.

Shinkle on the other hand testified that he gave the money because of his long association with the family and he wanted to help them. In addition, Shinkle said he felt bad that he and Deborah may have pushed Lard too strongly to undergo the first surgery over Lard's objections and his failure to convince Lard to undergo the second surgery. Shinkle denied that he gave the money expecting it to be paid back out of any settlement. Shinkle also denied the Board's claim that he gave the money to placate Lard, hoping that the case would go away.

Like the Commission, we find that Shinkle's payments may have caused the Lards to believe these payments were not gifts but advances on some type of further settlement. However, given the lack of any evidence to support the Lards' testimony, we are not convinced that the Lards' expectations were correct or that Shinkle made the payments to placate Lard, as the Board claimed.

## IV. Commission's Findings.

■ The Commission found that the Board failed to prove the allegations of neglect and misrepresentation. We agree and adopt this finding.

We have defined neglect as follows:

Neglect is not defined by our rules of ethics, but it has generally been recognized to involve indifference and a consistent failure to perform those obligations that a lawyer has assumed, or a conscious disregard for the responsibilities a lawyer owes to a client. Neglect is more than ordinary negligence and usually involves multiple acts or omissions. It is a form of professional incompetence that often involves procrastination, such as a lawyer doing little or nothing to advance the interests of a client after agreeing to represent the client.

An attorney who fails to file a claim on behalf of a client within the statute of limitations period is not necessarily subject to a professional disciplinary action.

*Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Moorman*, 683 N.W.2d 549, 551–52 (Iowa 2004) (citations omitted).

Here, as mentioned, the evidence was that the August 31, 1990 notice of final payment or suspension of compensation payments commenced the one-year limitation period for filing a claim. That notice was not sent to Shinkle. All of Shinkle's actions thereafter are consistent with his testimony that he did not learn of the notice until the fall of 1993 when Lard gave Shinkle the notice. Like the Commission, we do not think Shinkle would have (1) continued to seek medical treatment for Lard, (2) continued to seek medical opinions in Lard's favor, and (3) prepared the draft compensation claim had Shinkle known the limitation period had expired. At most, Shinkle may have been less than careful in not contacting the carrier when he learned in October 1990 that the carrier refused to pay for any more prescription refills. But Shinkle's failure in this regard does not rise to the level of neglect for disciplinary purposes.

Moreover, the record is devoid of any evidence that Shinkle concealed any neglect or misrepresented the status of the claim to Lard, as the Board alleged. We therefore agree with the Commission's dismissal of charges based on alleged violations of DR 1–102(A)(4), DR 6–101(A)(3), and DR 7–101(A).

■ The Commission, however, did find that Shinkle violated DR 5–103(B) when he gave Lard $1750 during his representation of Lard. We likewise agree with and adopt this finding.

As mentioned, Shinkle freely admitted, and his checks establish, that he gave Lard $1750 while he was representing Lard. That Shinkle gave Lard the money because the Lards were in financial need does not make the conduct any less unethical. *Comm. on Prof'l Ethics & Conduct v. Humphreys*, 524 N.W.2d 396, 398 (Iowa 1994) (rule prohibiting an attorney from giving client money does not make any exception when given out of humanitarian concern for client's poor financial situation) (citing *Comm. on Prof'l Ethics & Conduct v. Bitter*, 279 N.W.2d 521, 523 (Iowa 1979)). Moreover, that Shinkle was already representing Lard at the time he

gave the money to Lard does not eliminate the unethical nature of the act. *See Humphreys*, 524 N.W.2d at 398.

■ The Commission also found that the payments to Lard violated DR 1–102(A)(1), which prohibits a lawyer from violating a disciplinary rule. Because we find that Shinkle violated DR 5–103(B) by making the payments to Lard, we agree with and adopt this finding of the Commission.

■ The Commission did not find that the payments to Lard violated DR 1–102(A)(6), which prohibits a lawyer from engaging in any other conduct that adversely reflects on the fitness to practice law. However, because of the following finding made by the Commission, with which we agree and adopt, we find that such payments did violate DR 1–102(A)(6):

It is also the Commission's determination that the payment of checks or cash to the Lards caused a miscommunication or unrealistic expectations. The Lards believed that they had further claims. They believed that the payments were not [gifts] but advances on some type of further settlement. Mr. Shinkle maintained that they were gifts. The post 1993 payments coupled with bad communication caused confusion and may have deterred the Lards from seeking other remedies on their behalf.

■ DR 1–102(A)(6) implicates more than legal competence. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Stowers*, 626 N.W.2d 130, 133 (Iowa 2001). It also embraces one's character and one's suitability to act as an officer of the court. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mulford*, 625 N.W.2d 672, 683 (Iowa 2001). Giving a client money that resulted in miscommunication or unrealistic expectations and prevented the client from seeking other remedies certainly reflects on Shinkle's fitness to practice law

because such conduct lessens public confidence in the legal profession. *See Stowers*, 626 N.W.2d at 133 ("DR 1–102(A)(6) applies to 'conduct that lessens public confidence in the legal profession.'" (Citation omitted.)).

■ Unlike the Commission, we find that Shinkle did not violate DR 1–102(A)(5), which prohibits a lawyer from engaging in conduct prejudicial to the administration of justice. While there is "no typical form of conduct that prejudices the administration of justice," a "common thread" is that "the attorney's act hampered the efficient and proper operation of the courts or of ancillary systems upon which the courts rely." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Steffes*, 588 N.W.2d 121, 123 (Iowa 1999). Shinkle's act of giving money to Lard does not seem to us to impact the "efficient and proper operation of the courts."

### V. Discipline.

■ Selecting the appropriate discipline in any disciplinary case requires that we "'consider the respondent's fitness to continue in the practice of law, deterrence of others from similar conduct, and assurance to the public that the courts will maintain the ethics of the profession.'" *Bitter*, 279 N.W.2d at 523 (citation omitted).

■ We have said that violation of DR 5–103(B), avoiding acquisition of an interest in litigation, alone "does not constitute a serious infraction." *Humphreys*, 524 N.W.2d at 398. One attorney received a two-month suspension for violating this provision by advancing money to clients, neglecting a client's matter in respect to clearing a title objection in a real estate matter, having twenty-six probate delinquencies, and adding his name as payee on a client's check. *Bitter*, 279 N.W.2d at 524–25, 527.

Shinkle was given a private admonition in 1987 for neglect, a violation different from the violations proven here. He has no other disciplinary record.

In light of the foregoing and given the unique facts of this case, we think the Commission's recommendation of a public reprimand is appropriate.

Costs are taxed to Shinkle pursuant to Iowa Court Rule 35.25.

**ATTORNEY REPRIMANDED.**