# IN THE SUPREME COURT OF IOWA

No. 96 / 06-0587

Filed September 22, 2006

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**RODNEY T. CARROLL**,

Respondent.

On review of the report of the Grievance Commission.

Grievance Commission report in disciplinary proceeding recommended revoking respondent's license to practice law. **LICENSE REVOKED.**

Charles L. Harrington and Wendell J. Harms, for complainant.

Rodney T. Carroll, Dubuque, pro se.

**LAVORATO, Chief Justice.**

In this lawyer disciplinary proceeding, we review the Grievance Commission's recommendation that Rodney T. Carroll's license to practice law in Iowa be revoked for theft of money entrusted to him. Upon our de novo review, we agree with the Commission's recommendation.

## I. Facts.

We find the following facts. Rodney T. Carroll was admitted to practice in Iowa and began practicing in September 1999. He worked at the O'Connor & Thomas law firm in Dubuque, Iowa. In 2000 he was admitted to practice in Wisconsin.

Carroll served as an adjunct professor at Loras College where he coached the college's mock trial teams. He held that position until the spring of 2003 when he resigned because of other professional commitments unrelated to these events.

The Dubuque Arts Council (Council) is a nonprofit group that provides educational and entertainment opportunities in the performing arts through the sponsorship of artist residencies. During their residencies, which typically last two weeks, the artists live and perform in the Dubuque area. The artists travel throughout the area school systems bringing into the classrooms arts-based education, which schools typically cannot afford. The Council also sponsors a free summer concert series in the Dubuque Arboretum and other events. Donors and grants support the Council's activities.

Carroll became involved with the Council in 2000. He initially served on Council committees. In May 2002 Carroll was elected president and was reelected president in May 2003. At the time of Carroll's reelection, the long-time Council treasurer resigned. Because there was no one to replace

him, the treasurer simply turned over the Council's check book to Carroll, who was an authorized signatory on the account. Later in the month, Carroll took possession of the Council's credit (debit) card.

Shortly after taking over the treasurer's duties, Carroll faced a personal budget shortfall. According to Carroll, his expenses were outpacing his income because of poor budget decisions on his part. On June 1, 2003, gas service at Carroll's home was terminated because he had failed to pay the gas bill on time. Because he was short of cash, Carroll paid the gas bill with the Council's credit card in the amount of $1131.85.

On June 3 Carroll wrote a check on the Council's account for $5000, which he deposited into his personal bank account. On June 27 Carroll wrote a check on the Council's account for $500, which he deposited into his personal bank account. On July 11 Carroll used the Council's credit card to purchase merchandise for $27.65 from Dubuque Discount Gas, to purchase services for $89.22 from OnStar, and to purchase services for $137.28 from Sheraton Hotels.

On July 14 Carroll wrote a check on the Council's account for $1500, which he deposited into his personal account. On the same day Carroll used the Council's credit card to purchase merchandise from a restaurant for $63. On July 15 Carroll wrote a check on the Council's account for $1000, which he deposited into his personal account.

The amount of these withdrawals and purchases totaled $9449. All of these transactions were without the Council's knowledge, consent, or authorization. In the months of June and July, Carroll paid Council obligations in the amount of $1500 from his personal account, reducing the total amount of the unauthorized withdrawals and expenditures to $7449.

In July the Council learned of Carroll's unauthorized use of Council funds. Council representatives and its attorney immediately confronted Carroll about his actions. Carroll ultimately paid back all of the money he had misappropriated. In addition Carroll reimbursed the Council $1255 for the cost of an audit necessitated by his actions. Because of Carroll's misconduct, the Council received negative publicity causing its fundraising activities to suffer for the next six to eight months.

In July Carroll reported his actions to the Iowa Supreme Court Attorney Disciplinary Board. Carroll was unaware that the Council's attorney had also reported the matter to the Board. Although Carroll did not report the matter to the Wisconsin Bar Association, a member of his firm did. The Wisconsin Bar Association summarily suspended Carroll's Wisconsin license, delaying any further action until our decision on this matter.

In August Carroll resigned from his law firm. In October Barnstead International hired him as a regulatory specialist to help the company with its relationship with the Food and Drug Administration. Barnstead International hired Carroll with full knowledge of his wrongdoing in this matter. Two years later, the company promoted Carroll to manager of the regulatory affairs department. In that position he has a six-person staff reporting to him, and he manages a $400,000 budget.

In February 2004 Carroll was charged with second-degree theft, a class D felony, in violation of Iowa Code sections 714.1(1), 714.1(3), and 714.2(2) (2003). He pled guilty to that charge for which he received a deferred judgment. Carroll was placed on probation for twenty-four months and ordered to complete 100 hours of approved community service.

## II. Disciplinary Proceedings.

On November 21, 2005, the Iowa Supreme Court Attorney Disciplinary Board filed a complaint against Carroll. The complaint alleged the foregoing unauthorized transactions as well as the criminal charge and its disposition. As a result of that behavior, the Board alleged that Carroll violated the following provisions of the Iowa Code of Professional Responsibility for Lawyers: DR 1-102(A)(3) (lawyer shall not engage in illegal conduct involving moral turpitude); DR 1-102(A)(4) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1-102(A)(5) (lawyer shall not engage in conduct that is prejudicial to the administration of justice); and DR 1-102(A)(6) (lawyer shall not engage in any other conduct that adversely reflects on the fitness to practice law).

Carroll did not file an answer to the complaint. His failure serves as an admission of the allegations of the complaint, leaving the Commission with the determination of what sanction is appropriate. *See* Iowa Ct. R. 36.7 ("If a respondent fails or refuses to file such answer within the time specified, the allegations of the complaint shall be considered admitted, and the matter shall proceed to a hearing on the issue of the appropriate sanction.").

The Commission heard the matter on March 16, 2006. A Council representative testified. Carroll represented himself and made a statement in which he expressed remorse. He stated that at the time of the unauthorized transactions, he intended to reimburse the Council. He explained that he planned to use funds from the sale of his house to do so.

The Commission concluded that Carroll had violated all of the disciplinary rules as charged and unanimously recommended that Carroll's license to practice law be revoked without the possibility of reinstatement.

### III. Scope of Review.

We review attorney disciplinary cases de novo. Iowa Ct. R. 35.10(1). Although we give respectful consideration to the Commission's recommendation, this court decides what discipline is appropriate under the unique facts of each case. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Shinkle*, 698 N.W.2d 316, 318 (Iowa 2005).

### IV. Ethical Violations.

The Board has the burden to prove the alleged violations by a convincing preponderance of the evidence. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dull*, 713 N.W.2d 199, 201 (Iowa 2006). As mentioned, Carroll's failure to file an answer to the Board's complaint serves as an admission of the allegations of wrongdoing.

Like the Commission, we find the Board proved the violations of the disciplinary rules as alleged in its complaint. In *Iowa Surpreme Court Board of Professional Ethics & Conduct v. Bell*, an attorney, while serving as treasurer of a nonprofit organization, misappropriated money from it. 650 N.W.2d 648, 649-50 (Iowa 2002). We concluded that the attorney engaged in illegal conduct involving moral turpitude, engaged in conduct involving dishonesty, and engaged in conduct that adversely reflects on the fitness to practice law in violation of DR 1-102(A)(3)-(4), (6). *Id.* at 651-52. Like Bell, Carroll violated DR 1-102(A)(3)-(4), (6), when he took money from the Council.

A lawyer who commits a felony violates DR 1-102(A)(5), which prohibits conduct prejudicial to the administration of justice. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lyzenga*, 619 N.W.2d 327, 330 (Iowa 2000). Carroll pled guilty to second-degree theft, which is a felony. The fact that he received a deferred judgment does not excuse the violation of this

disciplinary rule. *See Comm. on Prof'l Ethics & Conduct v. Patterson,* 369 N.W.2d 798, 801 (1985) ("[W]hen those licensed to operate the law's machinery knowingly violate essential criminal statutes, there inexorably follows an intensified loss of lay persons' respect for the law.").

Having found that the Board proved the violations as alleged in the complaint, we now turn to the question of the appropriate discipline.

**V. Discipline.**

In *Bell* we stated the reasons that guide us in determining what is an appropriate sanction in a particular case:

> The appropriate sanction in a particular case depends upon several factors that reflect the broad purpose of our disciplinary system. The disciplinary process is intended to protect not only the public, but also our system of justice. Therefore, we consider the nature and extent of the respondent's ethical violations not only to determine the respondent's fitness to practice law, but also to assess the need to deter other lawyers from similar misconduct. Only by ensuring that such conduct does not become commonplace or acceptable can we maintain the reputation of the bar and safeguard the integrity of our system of justice and the public's confidence in it.

*Bell,* 650 N.W.2d at 652 (citations omitted).

As in *Bell,* the nature of Carroll's ethical violations is indeed serious. Several times over, we have said that " 'it is almost axiomatic that the licenses of lawyers who convert funds entrusted to them should be revoked.'" *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Anderson,* 687 N.W.2d 587, 590 (Iowa 2004) (citation omitted). We have noted that "[i]nstances in which revocation has not been ordered for the taking of client's money or fiduciary funds have involved situations in which the attorney had a colorable future claim to the funds or did not take the funds for [the lawyer's] own use." *Id.* (citing those instances). We likewise have made clear that we have not hesitated to revoke a license in situations in

which the converted funds have been returned prior to any discovery by the client or third party. *Id.* Nor have we been deterred from revoking a lawyer's license because the funds converted were not client funds or because the attorney was not acting in the capacity of an attorney at the time of the misconduct. *Bell,* 650 N.W.2d at 652.

Carroll had no colorable claim to the funds, no authority to use the credit card, and no authority to make the withdrawals as he did. As in *Bell,* Carroll "simpl[y] . . . stole someone else's money." *Id.* at 655. He did this not once, but nine times. Moreover, his conduct caused harm to the Council—a temporary decline in donations, likely attributable to the negative publicity generated by Carroll's actions. In short, we think Carroll's actions are just too serious to warrant any discipline less than revocation. Accordingly, we revoke Carroll's license to practice law in this state. Costs are taxed to Carroll. *See* Iowa Ct. R. 35.25(1).

**LICENSE REVOKED.**