# IN THE SUPREME COURT OF IOWA

No. 02 / 06-1362

Filed May 25, 2007

**IOWA SUPREME COURT ATTORNEY
DISCIPLINARY BOARD**,

Appellee,

vs.

**GREGORY ALAN JOHNSTON**,

Appellant.

_____

On review of the report of the Grievance Commission.

Grievance Commission reports that respondent has committed ethical misconduct and recommends a suspension from the practice of law. **LICENSE SUSPENDED**.

Mark McCormick of Belin Lamson McCormick Zumbach Flynn, Des Moines, for appellant.

Charles L. Harrington and Wendell J. Harms, Des Moines, for appellee.

**CADY, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board (Board) charged Gregory Alan Johnston with numerous violations of the Iowa Code of Professional Responsibility for Lawyers for his involvement in a business transaction with a client. The Grievance Commission of the Supreme Court of Iowa (Commission) found Johnston violated the Iowa Code of Professional Responsibility for Lawyers and recommended he be suspended from the practice of law for a minimum period of six months. Upon our review, we indefinitely suspend Johnston's license to practice law with no possibility of reinstatement for three months.

## I. Background Facts and Proceedings.

Johnston is an Iowa lawyer. He was admitted to practice law in 1977, and is a sole practitioner in Muscatine. He was publicly reprimanded in 1991 for failing to file Iowa and federal income tax returns from 1984 to 1988. He has no other record of discipline. He is known as a bright and innovative advocate by other lawyers in his community.

Johnston represented Nelson Electric, Inc. In 2000, the corporation obtained a judgment of $4000 against a Muscatine building contractor named Thomas Corcoran. In 2001, the corporation obtained a second judgment against Corcoran for $1170.84. Several other individuals and businesses also acquired judgments against Corcoran during this period of time. One of the creditors, Jeff King, Inc. (King), executed on its judgment against two parcels of real estate owned by Corcoran in Muscatine, known as the blue building and the red building. The properties were subsequently purchased by King at a sheriff's sale for $5868. Corcoran was allowed a period of 180 days to redeem the property. The Nelson Electric judgment of $4000 was the only senior

lien, and King paid the judgment, plus interest. Upon the apparent insistence of Nelson Electric, Johnston then set out to protect the remaining Nelson Electric judgment of $1170.84, in a rather complex and unusual manner.

Johnston first proposed to protect Nelson's junior judgment by preparing an involuntary bankruptcy petition against Corcoran, but eventually decided to personally meet with Corcoran to discuss the situation. Johnston met with Corcoran on February 17, 2002, the day before Corcoran's right of redemption would expire, in an Illinois jail where Corcoran was imprisoned. After discussing the situation, Johnston and Corcoran mutually agreed the best course of action was for Corcoran to assign his right of redemption to Johnston as agent for Nelson Electric, with Corcoran reserving the right to purchase the property back within a certain amount of time. Johnston believed this would allow Nelson Electric to protect its judgment by redeeming the property, and would also give Corcoran the ability to retain his property by buying it back at a later date. Accordingly, Corcoran signed a written acknowledgment indicating the assignment of his redemption rights to Johnston. The writing did not mention Corcoran's right to purchase the property back, or explain whether Johnston was acquiring redemption rights for himself or as an agent for Nelson Electric. Johnston then paid Corcoran all the money he had with him—$20 in cash—in part payment of the $250 purchase price. Johnston told Corcoran he would visit him the next day so the parties could complete their business.

The next day, the day Corcoran's period of redemption would expire, Corcoran and Johnston discussed the matter again. Johnston told Corcoran he believed the interest rate imposed on the judgment by King, the creditor who purchased the property at the sheriff's sale, was

excessive. Johnston offered to represent Corcoran in an action to challenge the interest rate, which, if successful, would reduce the amount needed to redeem the properties. In doing so, he mentioned it would conflict with his representation of Nelson Electric.

Johnston then obtained the oral consent of Nelson Electric to represent Corcoran, and visited Corcoran later in the day to finalize the assignment of Corcoran's right of redemption and to represent Corcoran to challenge the interest rate. Johnston provided Corcoran with a written letter that disclosed the conflict of interest presented by representing him while also representing Nelson Electric. The letter disclosed that Johnston was only representing Corcoran to reduce the interest rate, and further stated that Johnston might ultimately purchase the properties. Johnston also had Corcoran sign two warranty deeds that he "anticipated using to transfer the title." The deeds, however, did not name a grantee. At the time Johnston did not know if he, Nelson Electric, or a partnership between them would take title to the properties.

Later that day Johnston filed papers with the district court to redeem the properties. In doing so, Johnston deposited $11,497.01 with the clerk of court. Johnston obtained the funds to redeem the property from Nelson Electric, even though the redemption amount included $4556.14 to reimburse King for the amount it had previously paid Nelson Electric in discharging Nelson Electric's senior lien.

Johnston also filed an objection to the amount of the redemption, and asked the clerk to hold the redemption funds until the court determined the correct amount of the redemption. In all documents filed with the court, Johnston identified himself as the attorney for Corcoran

and that he was filing the redemption and objection on behalf of Corcoran.

Johnston then promptly met with King's attorney to begin negotiations over the objection to the redemption amount. On February 28, Johnston filed a stipulation in the King foreclosure action indicating King and Corcoran agreed the amount of redemption was $10,632.32, and the excess amount deposited with the clerk would be payable to Johnston as the attorney for Corcoran. On March 1, the district court approved the redemption amount and ordered the funds to be distributed.

Around this same time Johnston discovered Corcoran had deeded his interest in the blue building to a friend named Laura Enke. Johnston promptly negotiated an agreement to purchase her interest for $500 in exchange for a deed to the property. When the deed was signed on March 25, 2002, it did not name a grantee. By the time the deed was recorded on January 6, 2003, Welch Apartments, an entity owned by Johnston, was named the grantee.

Corcoran contacted Johnston by letter on April 5, 2002 to clarify the agreement regarding the property. In the letter he indicated he would like to sell the red building for $60,000 to pay off all his debts. He also intimated he would like Johnston to rent the blue building to pay the building's taxes and insurance, with remaining proceeds placed into his checking account. Corcoran said he would sign a power of attorney to enable Johnston to act for him, and concluded by saying, "I hope you hang with me and charge or pay whatever you feel necessary."

Johnston and Corcoran subsequently spoke over the phone about the letter. Johnston said it was not his job to find a buyer for Corcoran, and that he would not be his manager for the properties. Corcoran next

communicated with Johnston in November of 2002. At this time Corcoran sent another letter to Johnston and stated he hoped Johnston was still helping him, and that "we should get down to business." Corcoran specifically wanted Johnston to try to sell his properties to Tom Meeker for $65,000, and told Johnston he could keep $40,000 from the sale. Johnston did not respond to this letter because he believed Corcoran's right to buy back the properties had expired.[1] Johnston acknowledged, however, that it was "probably very poor practice to not respond," and that he "should have responded and said . . . you're wrong, you're done."

Corcoran mailed another letter to Johnston in December of 2002. In this letter, Corcoran told Johnston that Meeker had agreed to buy his properties for $60,000, and that Johnston could keep $40,000 of it to pay off Corcoran's debts. Corcoran also mentioned that he had a year in which to buy back the property according to their agreement, and that he "still [has] two months to spare." Johnston again did not respond to this letter. He believed Corcoran was attempting to extract money from him, and discontinued further discussions with him.

Nelson Electric, the entity whom Johnston claimed was the moving force for the legal maneuvering to collect the judgment of $1170.84, later decided it did not wish to pursue the collection any further. As a result, Johnston acquired the interest of Nelson Electric in the properties by giving Nelson Electric a credit of $20,000 for the legal services it owed

---

[1]Notably, Johnston claims Corcoran's right to redeem the property was only extended by six months pursuant to their agreement entered February 18, 2002. Thus, Johnston believes Corcoran's right to redeem the property expired in August of 2002, and therefore Johnston and Nelson, or whomever the grantee of the deeds would become, were the owners of the property. Their agreement in February of 2002 concerning Corcoran's right to redeem the properties was not reduced to writing, and therefore there is nothing that states whether Corcoran's right to redeem the properties was extended by six months as Johnston claims or by one year as Corcoran claims.

him. This allowed Johnston to continue to pursue his interest in the property. The properties remain encumbered by substantial debt and are the subject of current litigation to quiet title.

## II. The Board's Complaint.

The Board charged Johnston with multiple violations of the Iowa Code of Professional Responsibility for Lawyers. These violations included DR 1-102(A)(1) (lawyer shall not violate a disciplinary rule), DR 1-102(A)(6) (lawyer shall not engage in other conduct that adversely reflects on the fitness to practice law), DR 2-101(B)(4)(a) (lawyer shall not engage in the in-person or telephone solicitation of legal business), DR 2-103(A) (lawyer shall not recommend his or her own employment), DR 2-104(A) (lawyer shall not accept employment resulting from unsolicited advice), DR 5-101(A) (lawyer shall not accept employment under certain circumstances unless client consents and there is full disclosure), DR 5-103(A) (lawyer shall not acquire a propriety interest in client matters), DR 5-103(B) (lawyer shall not advance or guarantee financial assistance to clients), DR 5-104(A) (lawyer shall not enter into a business transaction with a client when there are differing interests), DR 5-105(B) (lawyer shall decline proffered employment in some circumstances), DR 5-105(C) (lawyer shall not continue multiple employment in some circumstances), DR 5-105(D) (lawyer may represent multiple clients in some circumstances), DR 7-101(A)(3) (lawyer shall not intentionally prejudice or damage a client), and DR 7-102(A)(8) (lawyer shall not knowingly engage in other illegal conduct or conduct contrary to a disciplinary rule). Johnston admitted he violated DR 2-101(B)(4)(a), DR 2-103(A), DR 2-104(A), and as a result also admitted he may have violated DR 1-102(A)(1).

The Commission found Johnston violated all of these rules except DR 2-104(A), DR 5-103(B) and DR 7-101(A)(3). It made several key findings to support the violations. The Commission found Johnston not only represented Corcoran in the action to challenge the interest rate, but also sought out Corcoran and ultimately represented him in the redemption of the property. It also found the representation continued after the interest rate matter was settled, and that Johnston not only inserted his own interests into the transaction, but represented the differing interests of Nelson Electric and Corcoran at the same time. Finally, the Commission found Johnston failed to fully compensate Corcoran for the purchase of his redemption rights in the properties.

The Commission recommended Johnston be suspended from the practice of law with no possibility of reinstatement for six months. It also recommended Johnston pay Corcoran $230 to satisfy the purchase of assigning the redemption rights.

On our review, Johnston challenges the Commission's conclusions that he violated certain disciplinary rules. He also attacks certain factual findings made by the Commission. Ultimately he requests we impose a sanction that does not include the suspension of his law license.

### III.  Standard of Review.

We review attorney disciplinary matters de novo. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Bernard*, 653 N.W.2d 373, 375 (Iowa 2002). We give the findings of the Commission weight, but are not bound by them. *Id.*

### IV.  Contested Factual Findings.

Johnston alleges the Board failed to establish numerous findings made by the Commission. We consider these claims in addressing the disputed violations raised by Johnston on appeal.

### V. Violations.

We only address the violations Johnston contests on appeal. In the end, we agree he violated the disciplinary rules as determined by the Commission.

### A. Solicitation.

It is axiomatic in Iowa that a lawyer may not engage in the in-person solicitation of legal business. DR 2-101(B)(4)(a). The Commission found Johnston violated this rule of ethics when he offered to represent Corcoran in a claim to challenge the amount of the redemption. Johnston asserts the ethics prohibition does not apply because he did not solicit Corcoran for the purpose of pecuniary gain.

Even assuming Johnston did not solicit Corcoran for pecuniary gain, DR 2-101(B)(4)(a) prohibits in-person solicitation "under any circumstance."[2] DR 2-101(B)(4)(a). We have no pecuniary gain requirement. This approach recognizes that face-to-face solicitation by lawyers is "a practice rife with possibilities for overreaching, . . . undue influence, and outright fraud." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 641, 105 S. Ct. 2265, 2277, 85 L. Ed. 2d 652, 666 (1985). The circumstances of this case, looking back, breathe life into these unwanted possibilities and confirms our strict approach against in-person solicitation. Johnston violated DR 2-101(B)(4)(a) when he recommended his employment to challenge the amount of the redemption.

---

[2]Rule 7.3 of the ABA's Model Rules of Professional Conduct generally prohibits solicitation "when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain." Model Rules of Prof'l Conduct R. 7.3 (2003). That is not the approach under DR 2-101(B)(4)(a), or the approach under our new rules. *See* Iowa R. of Prof'l Conduct 32:7.3(a) ("A lawyer shall not by in-person, live telephone, or real-time electronic contact solicit professional employment from a prospective client.").

**B. Fitness to Practice.**

Ethical misconduct is defined in many ways under the rules of professional responsibility. DR 1-102 identifies the types of misconduct, including "illegal conduct involving moral turpitude," DR 1-102(A)(3), "conduct involving dishonesty, fraud, deceit or misrepresentation," DR 1-102(A)(4), conduct "prejudicial to the administration of justice," DR 1-102(A)(5), and "any *other* conduct that adversely reflects on the fitness to practice law," DR 1-102(A)(6) (emphasis added). This approach of listing the various forms of misconduct followed by "other" conduct reveals the broad nature of misconduct involving activities that adversely reflect on the fitness to practice law. It involves conduct other than the specific conduct identified in the rule, and focuses on matters that "lessen[] public confidence in the legal profession." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Marcucci*, 543 N.W.2d 879, 882 (Iowa 1996). We have also said it "implicates more than legal competence. It also embraces one's character and one's suitability to act as an officer of the court." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Shinkle*, 698 N.W.2d 316, 324 (Iowa 2005) (citation omitted).

The Commission found Johnston's conduct during the transaction violated this disciplinary rule in several ways, including pursuing the redemption in Corcoran's name after attaining an assignment of his right of redemption, backdating the assignment, failing to pay Corcoran the amount promised for the assignment, taking deeds to the property without a designated grantee, and failing to record the deeds to the property. Johnston claims this conduct either did not occur or falls short of conduct that adversely reflects on fitness to practice law.

We disagree with Johnston. He violated DR 1-102(A)(6) in at least one of the respects found by the Commission. Generally, the conduct

cited by the Commission to support the violation of the rule may or may not adversely reflect on Johnston's fitness to practice law. We are not prepared to say this conduct alone reflects adversely on his fitness to practice law. Only if this conduct is accompanied by an illegal or unethical purpose, motive or intent are we prepared to say he violated the rule. The commission obviously found such an intent when it rejected Johnston's testimony that Corcoran waived the remaining payment in lieu of Johnston's fee for representing Corcoran. We give weight to this finding and come to the same conclusion in our de novo review of the record.

A lawyer who fails to satisfy a financial obligation under a contract based on a false claim that the obligation was waived in exchange for legal services engages in conduct that adversely reflects on the practice of law. No attorney should assert loose, unsupported claims for attorney fees as a means to avoid contractual obligations. We agree with the Commission that Johnston engaged in conduct that adversely reflected on his fitness to practice law in violation of DR 1-102(A)(6).

## C. Acquiring Interest in Litigation.

DR 5-103(A) prohibits a lawyer from acquiring "a proprietary interest in the cause of action or subject matter of the litigation being conducted for the client," subject to exceptions not applicable in this case. DR 5-103(A). The Commission found Johnston violated this rule by representing Corcoran when he had purchased the assignment of his redemption rights. Johnston claims he did not violate the rule because there was no "litigation being conducted" for Corcoran once Johnston acquired Corcoran's redemption rights. In other words, Johnston claims he acquired Corcoran's interest in the litigation prior to representing him in the litigation.

Lawyers are generally prohibited from injecting themselves into the legal affairs of clients. *See Comm. on Prof'l Ethics & Conduct v. Bitter*, 279 N.W.2d 521, 523 (Iowa 1979). While DR 5-104 addresses the prohibition against engaging in business with clients, DR 5-103(A) specifically targets the acquisition of a proprietary interest in litigation being conducted by an attorney for a client. Recognizing the limitation in DR 5-103(A), Johnston attempts to sidestep the rule with his claim that Corcoran had no actual legal interest in the pending foreclosure litigation once Corcoran became his client.

While we recognize the obvious inconsistency in Johnston's claim, the record shows Johnston inserted himself into Corcoran's litigation and agreed to represent Corcoran in the litigation as a part of the same transaction. Clearly, Johnston's conduct violated DR 5-103(A). The rule captures conduct where a lawyer is both a litigator for a client in litigation and a party to the litigation.

### D. Conflict of Interest.

A client has a right to expect loyalty and independent judgment from an attorney. *See Comm. on Prof'l Ethics & Conduct v. Minette*, 499 N.W.2d 303, 305 (Iowa 1993). Many specific rules embrace this concept, including the final three disciplinary rules Johnston argues he did not violate: DR 5-101(A) (refusing employment when professional judgment may be affected by attorney's own interest), DR 5-104(A) (limiting business relations with clients), and DR 5-105(C) and (D) (multiple client representation). These rules do not apply if client consent has been obtained after full disclosure. *See* DR 5-101(A); DR 5-104(A); DR 5-105(C), (D).

The Commission found each rule was violated based on Johnston's multiple representation of Nelson Electric and Corcoran, as well as the

presence of his own interests, including his apartment operation. We agree the multiple interests involved in the transaction implicated DR 5-101(A), DR 5-104(A) and DR 5-105(C), (D). We are not persuaded by Johnston's argument that he did not violate DR 5-105(C) because he stopped representing Corcoran before he purchased Enke's deed to the blue building. Even though Johnston may have ended his representation of Corcoran before acquiring a deed to the property, he still represented Corcoran and Nelson Electric at a time when the exercise of his "independent professional judgment on behalf" of one client would be adversely affected by the representation of the other client. DR 5-105(C). During this time, both Nelson Electric and Corcoran had competing interests in the redemption of the property. Johnston could not exercise independent judgment for one client without adversely affecting his representation of the other. Because the consent obtained by Johnston failed to satisfy the full disclosure standard, which he admits, Johnston violated these disciplinary rules. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Fay*, 619 N.W.2d 321, 326 (Iowa 2000).

## VI. Discipline.

"The nature of the alleged violations, the need for deterrence, the protection of the public, maintenance of the reputation of the [Bar] as a whole, and the respondent's fitness to continue" to practice law are all relevant when determining the appropriate discipline. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Waters*, 646 N.W.2d 111, 113–14 (Iowa 2002). In addition, all aggravating and mitigating circumstances are considered. *Id.* Ultimately, discipline is imposed based on the particular facts of each case. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. McKittrick*, 683 N.W.2d 554, 563 (Iowa 2004).

We disagree with the Commission's factual finding that there are no mitigating circumstances in this case. We believe the testimony demonstrated Johnston to be a generally honest lawyer. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Isaacson,* 565 N.W.2d 315, 317 (Iowa 1997) ("We consider a lawyer's general character for honesty . . . in applying sanctions."). In addition, he acknowledged he violated our disciplinary rules in certain respects. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Tofflemire,* 689 N.W.2d 83, 93 (Iowa 2004) ("A mitigating factor is the attorney's recognition of some wrongdoing."). Furthermore, the prior discipline imposed on Johnston carries little weight as an aggravating factor under the circumstances of this case. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hohenadel,* 634 N.W.2d 652, 656 (Iowa 2002) (recognizing a previous reprimand was an aggravating circumstance "warranting more severe discipline"). Johnston's previous discipline was imposed more than eighteen years ago, was based on conduct unrelated to the present misconduct and no other discipline has been imposed since the past misconduct.

The misconduct engaged in by Johnston was unusual, and there is little precedent to serve as a guide in the imposition of discipline. Generally, sanctions in cases involving improper business transactions between lawyers and clients range from a public reprimand to revocation. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner,* 599 N.W.2d 721, 730 (Iowa 1999). While egregious violations of the canon 5 conflict of interest rules have resulted in lengthy periods of suspension, other violations have resulted in suspensions ranging from one to three months. *See Iowa Supreme Ct. Attorney Disciplinary Bd. v. Clauss,* 711 N.W.2d 1, 4–5 (Iowa 2006) (citing cases). Moreover, we have observed that an attorney who engages in a series of actions that collectively reveal

a general indifference to the core responsibilities owed to the client and the legal system as a whole warrants a suspension. *See, e.g., McKittrick*, 683 N.W.2d at 563 (three-month suspension).

Johnston violated numerous disciplinary rules by acquiring ownership rights in property that was the subject of his clients' litigation. In the end, the overall transaction engaged in by Johnston illustrates the reasons for the rules that discourage attorneys from becoming involved in client matters and that require lawyers to serve clients with the utmost loyalty and confidence. Under all the circumstances, we conclude Johnston should be suspended from the practice of law for a period of three months.

The Commission has requested that as part of Johnston's sanction we direct the clerk to tax the costs of reporting Corcoran's depositions to Johnston. Finding this request unopposed, we grant the Commission's request.

### VII. Conclusion.

We suspend Johnston's license to practice law in Iowa indefinitely, with no possibility of reinstatement for a period of three months from the date of filing of this opinion. The suspension imposed applies to all facets of the practice of law as provided by Iowa Court Rule 35.12(3), and requires notification to clients as provided in Iowa Court Rule 35.21. The costs of this proceeding are taxed against Johnston pursuant to Iowa Court Rule 35.25(1), and Johnston shall pay the costs of Corcoran's depositions.

**LICENSE SUSPENDED**.

All justices concur except Ternus, C.J., who takes no part.