# IN THE SUPREME COURT OF IOWA

No. 12–1203

Filed December 7, 2012

**IOWA SUPREME COURT
ATTORNEY DISCIPLINARY BOARD,**

   Complainant,

vs.

**PAUL J. BIEBER,**

   Respondent.

_____

   On review of the report of the Grievance Commission of the Supreme Court of Iowa.

   Grievance commission recommends suspension of attorney's law license for ethical violations. **LICENSE SUSPENDED.**

   Charles L. Harrington and Wendell J. Harms, Des Moines, for complainant.

   Mark S. Pennington of Kutmus, Pennington & Hook, P.C., West Des Moines, for respondent.

**MANSFIELD, Justice**.

An Iowa attorney helped facilitate a fraudulent real estate transaction in which the sales price was overstated by $55,000. The attorney subsequently pled guilty to misprision of a felony, *see* 18 U.S.C. § 4 (2006), and received probation. We are now asked to decide what ethical rules he violated and what the consequences should be.

This case comes before us on the report of a division of the Grievance Commission of the Supreme Court of Iowa (commission). *See* Iowa Ct. R. 35.10(1) (2009).[1] The Iowa Supreme Court Attorney Disciplinary Board (Board) alleged the respondent, Paul J. Bieber, violated several rules of professional conduct. The commission agreed and accordingly found that Bieber violated Iowa Rules of Professional Conduct 32:1.2(d), 32.1.16(a)(1), 32:4.1(a), 32:4.1(b), and 32:8.4(b). Additionally, the commission found that Bieber's felony conviction met the requirements for revocation or suspension under Iowa Code section 602.10122 (2011).

The commission recommended an indefinite suspension from the practice of law with no possibility of reinstatement for six months. Upon our consideration of the commission's findings of fact, conclusions of law, and recommendations, and our de novo review of the record, we agree Bieber has committed all the violations found by the commission. We also agree with the recommended sanction and order Bieber's license suspended indefinitely with no possibility of reinstatement for six months.

---

[1]Recent amendments to the Iowa Court Rules are not applicable in this case because the hearing was held prior to their effective date. *See* Iowa Ct. R. 35.26 (2012).

## I. Factual and Procedural Background.

Bieber was admitted to practice law in Iowa in 1980. At all relevant times in this proceeding, he has resided and maintained his law office in Scott County. Bieber's law practice includes divorce, personal injury, probate, and some real estate work. Bieber has no history of disciplinary violations. Bieber has a distinguished record of community involvement including service with the Davenport Historic Preservation Commission, the Salvation Army, Neighborhood Housing Services, and "In From the Cold," an organization that assists the homeless. Bieber also has been president of an inn of court and president of the board of a Catholic school.

On June 30, 2011, Bieber appeared in the United States District Court for the Southern District of Iowa and, under a plea agreement, pled guilty to misprision of a felony.[2] As agreed upon by Bieber and the federal government, Bieber was sentenced to three years of probation, which was within the federal sentencing guidelines. Bieber also was ordered to pay restitution to the lender in the amount of $37,969.99.

The facts of this transaction are set forth in the plea agreement:

> Mary Pat Lord, a real estate agent, had a listing for the sale of 1818 Esplanade Avenue, Davenport, Iowa, then owned by Denisa Woods. Lord arranged to sell the property to Darryl Hanneken and Robert Herdrich for the price of $100,000. Lord and the parties agreed that the HUD-1 Settlement Statement and other documents pertaining to the sale would reflect a price of $155,000, thereby allowing Hanneken and

---

[2]The elements of Misprision of Felony are 1) the principal committed and completed the alleged felony; 2) defendant had full knowledge of that fact; 3) defendant failed to notify the authorities; and 4) defendant took steps to conceal the crime.

*United States v. Cefalu*, 85 F.3d 964, 969 (2d Cir. 1996). Bieber had previously gone to trial on a number of federal charges. The case ended in a mistrial because the jury could not reach verdicts on those charges.

Herdrich to obtain a mortgage loan for $108,500, greater than the actual sale price. Further, Lord and the parties agreed that after proceeds of the sale had been paid to Woods, she would convey a $55,000 "cash back" payment (the difference between the actual price and inflated sale price) to Hanneken and Herdrich. The actual price and the existence of the cash back payment to Hanneken and Herdrich would be concealed from the mortgage lender, Interbay Funding, by omitting those details from the HUD-1 Settlement Statement.

Woods lived outside the Davenport area, so [Bieber], an attorney, was retained to act for Woods in connection with the sale and closing pursuant to a power of attorney. [Bieber] was aware of the lower actual price and the cash back payment, and the fact that those details would not be conveyed to the lender on the HUD-1 Settlement Statement.

[Bieber] did an affirmative act to conceal the offense, in that [Bieber] provided via the closing process information that falsely represented that the higher inflated price was the agreed price and failed to reveal the lower actual price and cash back payment. [Bieber] knew this information would be included on the HUD-1 Settlement Statement. [Bieber] also completed a declaration of value form that falsely represented the sale price.

On or about December 9, 2005, [Bieber] represented Woods at the closing for the sale of 1818 Esplanade and took custody of the proceeds of the sale on behalf of Woods. Thereafter, [Bieber] conveyed the $55,000 cash back payment to Hanneken.

. . . .

In connection with this transaction, [Bieber] did not collect any fees or payments except for his $400 fee for representing Woods, which was duly reflected on the HUD-1 form. [Bieber] acted in the interests of Woods in that he carried out her instructions to conduct the transaction.

On May 18, 2011, the Board filed an amended complaint alleging Bieber violated Iowa Rules of Professional Conduct 32:1.2(d), 32:1.16(a)(1), 32:4.1(a), 32:4.1(b), and 32:8.4(b). The Board also alleged that Bieber's felony conviction met the requirements for revocation or suspension under Iowa Code section 602.10122.

Bieber filed an amended answer admitting most of the allegations in the amended complaint. However, he specifically denied knowing that preparing the HUD-1 document with the inflated sale price amounted to criminal conduct. Additionally, while admitting that he knew the inflated sale price was false, Bieber denied that he had any knowledge the false statement was "material" to the lender.

A one-day hearing before the commission took place on June 6, 2012. Bieber conceded all of the violations charged by the Board except the alleged violations of rule 32:4.1 subparts (a) and (b).[3] He also acknowledged that his guilty plea had preclusive effect as to the elements of the crime he had admitted to. *See Emp'rs Mut. Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 23 (Iowa 2012) (noting the well-established rule that a guilty plea in an Iowa state court " 'precludes a criminal defendant from relitigating essential elements of the criminal offense in a later civil case arising out of the same transaction or incident' " (quoting *Dettmann v. Kruckenberg*, 613 N.W.2d 238, 244 (Iowa 2000))).

However, Bieber asserted that both he and his client Woods believed the $55,000 rebate would actually go toward needed repairs and improvements to the property. By their account, which no one disputed, Bieber and Woods were unaware the buyers intended simply to pocket the difference between the $108,500 they had borrowed and the $100,000 net they had transferred to Woods. Bieber also testified that he had repaid the $37,969.99 restitution ordered by the federal court.[4]

---

[3]Rule 32:4.1 prohibits "mak[ing] a false statement of material fact or law to a third person" or "fail[ing] to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client." *See* Iowa R. of Prof'l Conduct 32:4.1(a)–(b). As noted above, Bieber denied the inflated sales price was material given the real estate lending environment as it existed in 2005.

[4]We presume that this amount is what the lender ultimately lost after foreclosing on the property. Other participants in the transaction who were criminally

The Board proposed a six-month suspension of Bieber's law license; Bieber conceded a suspension was appropriate but argued for sixty days. After thoroughly discussing the relevant facts and law, the commission recommended that Bieber's license be suspended indefinitely with no possibility of reinstatement for six months.

## II. Scope of Review.

Our review of attorney disciplinary proceedings is de novo. Iowa Ct. R. 35.10(1); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Fields*, 790 N.W.2d 791, 793 (Iowa 2010). We give respectful consideration to the commission's findings and recommendations but are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lickiss*, 786 N.W.2d 860, 864 (Iowa 2010). The burden is on the Board to prove attorney misconduct by a convincing preponderance of the evidence. *Id.* "This burden is less than proof beyond a reasonable doubt, but more than the preponderance standard required in the usual civil case." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett*, 674 N.W.2d 139, 142 (Iowa 2004). It is also a less stringent burden than clear and convincing evidence which is "the highest civil law standard of proof." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ronwin*, 557 N.W.2d 515, 517 (Iowa 1996). If a violation is established, we "may impose a lesser or greater sanction than recommended by the commission." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Murphy*, 800 N.W.2d 37, 42 (Iowa 2011); *see also* Iowa Ct. R. 35.10(1).

---

convicted were also ordered to make the same restitution, but it was paid entirely by Bieber.

### III. Review of Alleged Ethical Violations.

The Board alleged, and the commission found, that Bieber violated five separate provisions of the Iowa Rules of Professional Conduct. Upon our review, we agree with those findings.

**A. Rule 32:1.2(d).** Rule 32:1.2(d) forbids a lawyer from "counsel[ing] a client to engage, or assist[ing] a client, in conduct that the lawyer knows is criminal or fraudulent." Iowa R. Prof'l Conduct 32:1.2(d). Comment 9 to rule 32:1.2 explains that "[p]aragraph (d) prohibits a lawyer from knowingly counseling or assisting a client to commit a crime or fraud." *Id.* r. 32:1.2(d) cmt. 9. Comment 10 explains that a lawyer in a situation such as Bieber's "is required to avoid assisting the client . . . by drafting or delivering documents that the lawyer knows are fraudulent." *Id.* r. 32:1.2(d) cmt. 10.

Rule 32:1.2(d) took effect on July 1, 2005, and since that time we have not applied it in any disciplinary opinions. However, the language of rule 32:1.2(d) is substantially similar to our prior disciplinary rule DR 7–102(A)(7), which stated in part, "In the representation of a client, a lawyer shall not . . . [c]ounsel or assist a client in conduct that the lawyer knows to be illegal or fraudulent." We find cases interpreting prior disciplinary rule DR 7–102(A)(7) to be instructive in this matter. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Gailey*, 790 N.W.2d 801, 806 (Iowa 2010) (relying on cases applying prior disciplinary rule DR 7–104(A)(1) in interpreting its successor, rule 32:4.2(a)).

For example, in *Iowa Supreme Court Attorney Disciplinary Board v. Nelsen*, the respondent represented a failed business that owed $3.6 million to a bank. 807 N.W.2d 259, 261 (Iowa 2011). Nelsen misrepresented to the bank that he would deposit the business's accounts receivable checks into his trust account. *Id.* at 266. Instead,

Nelsen contravened a court order by sending most of these checks to his clients out of state. *Id.* Ultimately, Nelsen assisted his clients in diverting at least $141,335.34 in accounts receivable from the control of the court-appointed receiver. *Id.* at 265. Nelsen did not receive any personal benefit from the funds and was not charged with any crimes. *Id.* at 267. We nonetheless found that his conduct violated DR 7–102(A)(7) and amounted to "knowingly assist[ing] his clients in defrauding the bank." *Id.* at 266.

Bieber does not contest that he violated rule 32:1.2(d). Bieber knew the actual sales price was only $100,000 but was being reported as $155,000. He also knew that the buyers were receiving a $108,500 loan based on the overstated price. He assisted his client in concealing the actual sales price from the lender by processing a HUD-1 Settlement Statement, preparing and executing an Iowa Declaration of Value form, and faxing closing figures to the title company in Illinois, all of which reflected the inflated sales price. At the closing, Bieber took possession of the sale proceeds and issued the $55,000 refund to the buyers from his trust account. Under these facts, we find that Bieber knowingly assisted his client in defrauding the buyer's lender, Interbay Funding. Thus, Bieber violated Rule 32:1.2(d). *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Romeo*, 554 N.W.2d 552, 553–55 (Iowa 1996) (suspending an attorney for three years who assisted a client under criminal investigation by making false receipts "to get the heat off of his client," and cover up his client's role as a "fence").

**B. Rule 32:4.1.** Rule 32:4.1(a) states "a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person." Iowa R. Prof'l Conduct 32:4.1(a). Rule 32:4.1(b) provides, "In the course of representing a client, a lawyer shall not knowingly . . . fail

to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by rule 32:1.6." *Id.* r. 32:4.1(b). The commission found that Bieber violated both subparts (a) and (b) of rule 32:4.1.

Bieber disputes that his conduct violated these rules. At the hearing, Bieber admitted he knew the sale price was inflated, but denied that he had any knowledge the false statement was "material" to the lender, Interbay Funding. Bieber contended that because Interbay Funding was making "liar loans" that did not require income verification, the actual sales price was not material to it.

We are not persuaded. The issue here is not whether the buyers had provided verification of income, but whether the actual sales price of the property mattered. Those are two different things.[5] Because of the fraud, Interbay Funding wound up lending the buyers $108,500, which was $8500 more than they were really paying for the property. Logic dictates that the overstatement was material; otherwise, the parties would not have engaged in their elaborate charade but would have simply told the bank this was a $100,000 transaction. In the absence of some specific evidence that the actual sales price would not have mattered to this lender, we find the inference of materiality to be established here.

Bieber knowingly processed sales paperwork with an inflated purchase price, faxed the inflated closing figures on his client's transaction to the title company in Illinois, and completed a declaration of value form that falsely represented the sale price. Bieber's

---

[5]It is entirely possible that the lender did not care much about the borrowers' ability to repay the loan from their personal assets, but would have wanted to be able to recoup the loan amount by foreclosing on the property if necessary.

misrepresentation of the sales price in the transaction constituted a false statement of material fact. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Gallner*, 621 N.W.2d 183, 187 (Iowa 2001) (finding that an attorney who enabled clients to receive increased social security disability benefits by exaggerating attorney's fees in reports to Social Security Administration knowingly made false statements of fact). At no point did he make any attempt to disclose the misrepresentations contained in the sales paperwork. We agree with the commission that this conduct violated both subsections of rule 32:4.1.

**C. Rule 32:8.4(b).** Rule 32:8.4(b) makes it "professional misconduct for a lawyer to . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." Iowa R. Prof'l Conduct 32:8.4(b).

> [I]n order for a criminal act to constitute a violation of rule 32:8.4(b),
>
> " '[t]here must be some rational connection other than the criminality of the act between the conduct and the actor's fitness to practice law. Pertinent considerations include the lawyer's mental state; the extent to which the act demonstrates disrespect for the law or law enforcement; the presence or absence of a victim; the extent of actual or potential injury to a victim; and the presence or absence of a pattern of criminal conduct.' "

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weaver*, 812 N.W.2d 4, 11 (Iowa 2012) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 767 (Iowa 2010)).

Bieber acknowledged violating this rule, and the commission so found. We have no difficulty reaching the same conclusion. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Schall*, 814 N.W.2d 210, 212–13 (Iowa 2012) (finding an attorney who pled guilty to three aggravated misdemeanor counts of fraudulent practice in the third degree for failure

to timely file tax returns had violated rule 32:8.4(b)). In this case, there was more than a "rational connection" between Bieber's conduct and his fitness to practice law. *See Templeton*, 784 N.W.2d at 767. The criminal behavior actually involved actions undertaken by Bieber in his capacity as Woods's attorney.

As part of the factual basis for the guilty plea, Bieber admitted that he

> did an affirmative act to conceal the offense, in that [he] provided via the closing process information that falsely represented that the higher inflated price was the agreed price and failed to reveal the lower actual price and cash back payment . . . . [Bieber] also completed a declaration of value form that falsely represented the sale price.

This admission demonstrates that Bieber had a culpable mental state. *See Templeton*, 784 N.W.2d at 767. Interbay Funding was victimized and substantially harmed by Bieber's misconduct. *See id.* This is evidenced by the plea agreement ordering him to make restitution in the amount of $37,969.99 to Bayview Loan Servicing, the successor company to Interbay.

Again, the conduct that provided the factual basis for Bieber's guilty plea related directly to his representation of Woods in the real estate transaction. Bieber's knowing preparation, processing, and transmission of real estate sale documents containing an affirmative material misrepresentation bear directly on his honesty, trustworthiness, and fitness as a lawyer. Thus, we find Bieber's felony conviction constitutes misconduct under rule 32:8.4(b).

**D. Rule 32:1.16(a)(1).** Rule 32:1.16(a)(1) states, "[A] lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if . . . the representation will result in violation of the Iowa Rules of Professional Conduct or other

law." Iowa R. Prof'l Conduct 32:1.16(a)(1). Bieber conceded that his conduct violated rule 32:1.16(a)(1), and we agree.

As discussed above, Bieber knew that his representation of Woods in her real estate transaction would result in the perpetration of a fraud on a lender. Thus, he knew that such representation would cause him to violate rules 32:1.2(d) and 32:4.1(a)–(b). Nonetheless, Bieber continued to represent Woods and made no attempt to withdraw. Accordingly, we find Bieber violated rule 32:1.16(a)(1). *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dunahoo*, 799 N.W.2d 524, 531 (Iowa 2011) (finding an attorney in violation where he failed to "limit his scope of representation to matters in which he could ethically represent" his client).

As Bieber acknowledged at the hearing (with commendable candor):

> Q. . . . Could these two gentlemen, I refer to loosely, Herdrich and Hanneken, have done this without attorneys like you at the time not doing your job? A. No, they couldn't have. I mean, it's one of those things that, you know, as we were going through the trial, that occurred to me, that their successful completion of their plan required the participation of somebody such as myself.
>
> Q. Are you proud of that? A. No, I should have known better than that. I mean, that's the thing about it is, you know, I had the responsibility that I should have figured out what was going on and I didn't.
>
> Q. Does that bother you? A. Yeah, it does. I mean, like I said, it's one of those things that, as we were going through it, it was definitely clear to me that, you know, there were multiple players that were required to make their plan work. And, you know, I was one of those players. And if it— I mean, if somebody hadn't done the part of it that I did, they wouldn't have been able to pull it off.

**IV. Consideration of Appropriate Sanction.**

We now consider the appropriate sanction for Bieber's violation of our disciplinary rules. "We craft appropriate sanctions based upon each case's unique circumstances, although prior cases are instructive." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kallsen*, 814 N.W.2d 233, 239 (Iowa 2012).

> We have repeatedly held that the goal of our ethical rules is to maintain public confidence in the legal profession as well as to provide a policing mechanism for poor lawyering. Important considerations include the nature of the violations, protection of the public, deterrence of similar misconduct by others, the lawyer's fitness to practice, and our duty to uphold the integrity of the profession in the eyes of the public. In fashioning the appropriate sanction, we look to prior similar cases while remaining cognizant of their limited usefulness due to the variations in their facts. Often, the distinction between the punishment imposed depends upon the existence of multiple instances of neglect, past disciplinary problems, and other companion violations, including uncooperativeness in the disciplinary investigation. Aggravating and mitigating circumstances are also important.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Humphrey*, 812 N.W.2d 659, 666 (Iowa 2012) (citations and internal quotation marks omitted).

"A felony conviction is grounds for revocation or suspension of an attorney's license to practice law." *See Weaver*, 812 N.W.2d at 13 (citing Iowa Code § 602.10122(1)). "The record of conviction is conclusive evidence." Iowa Code § 602.10122(1).[6]

---

[6]Iowa Code section 602.10122 states in relevant part:

> The following are sufficient causes for revocation or suspension:

> 1. When the attorney has been convicted of a felony. The record of conviction is conclusive evidence. . . .

The commission recommended a six-month suspension, noting we have "consistently imposed harsh sanctions for lawyer's commission of criminal conduct involving fraud and dishonesty." The commission found Bieber's lack of a prior disciplinary record, status as a respected lawyer, and cooperation with the Board in the proceedings to be mitigating factors. The commission also noted that Bieber did not seek or receive additional profit from the transaction, did not devise or manage the fraudulent scheme, promptly reported his conviction to the Board, and appeared sincerely remorseful. As aggravating factors, the commission considered that Bieber "represented other sellers in similar transactions" and, during the hearing, Bieber "suggested that he honestly believed there was nothing wrong with using an inflated price on closing documents to allow a buyer to get money back to make repairs."[7] Bieber also presented evidence at the hearing that he has recently been treated for kidney cancer.

All of the violations in this case stem from Bieber's representation of Woods in the 2005 real estate transaction and his subsequent felony conviction for misprision of a felony in federal court. Bieber's misconduct involves an element of deceit. We have repeatedly held that:

---

[7]We question to some extent the Board's reliance on these aggravating factors. Bieber's attorney acknowledged that Bieber had been involved in four or five transactions where money went back to Hanneken and Herdrich. However, only one transaction was charged by the Board, and evidence was presented only as to that transaction. Also, it is true that Bieber's attorney (not Bieber) said at one point Bieber "did not think it was a scheme and thought this was just fine, and it wasn't." Yet this off-the-cuff remark needs to be placed in the context of the entire hearing. Bieber consistently took responsibility for his conduct and admitted it was fraudulent. His attorney made the foregoing statement as a way of emphasizing that Bieber understood at the time that the $55,000 kickback was going into building repairs rather than being kept by Hanneken and Herdrich. The evidence that Bieber had that belief was unrebutted. Overall, we think Bieber's attorney mounted a vigorous but proper defense of his client at the commission hearing.

> [f]undamental honesty is the base line and mandatory requirement to serve in the legal profession. The whole structure of ethical standards is derived from the paramount need for lawyers to be trustworthy. The court system and the public we serve are damaged when our officers play fast and loose with the truth.

*Kallsen*, 814 N.W.2d at 239 (citation and internal quotation marks omitted). Although we do not have any cases where we sanctioned an attorney for misconduct identical to Bieber's, we do find the following authorities to be instructive.

In the *Nelsen* case, discussed above, we revoked the attorney's license for aiding and abetting his clients in converting funds even though the attorney had not received any personal gain from those funds. 807 N.W.2d at 267–68. However, in that case the attorney was involved in a theft: He knowingly redirected $141,335.34 in accounts receivable that belonged to a third-party secured creditor to his clients. *Id.* at 261, 267. Our decision cited "the long-standing policy of this state regarding attorneys who convert the funds of others." *Id.* at 267. As we explained, "This policy makes it clear that it is almost certain that we will revoke the license of any attorney involved in the conversion of funds." *Id.*

We think that conduct was more egregious than the conduct here. In *Nelsen*, the attorney knew his clients were stealing money and helped them do it. In this case, there is no evidence that Bieber knew the buyers were walking away with someone else's money. The record shows at most that Bieber enabled a lender to be defrauded into lending more than it would otherwise have been willing to lend. Nelsen's case also demonstrated callous disregard for court orders and resulted in significantly greater financial harm than the case at hand. *Id.* at 267.

*Iowa Supreme Court Attorney Disciplinary Board v. Polsley*, like *Nelsen*, involved theft of property. 796 N.W.2d 881 (Iowa 2011). The respondents in *Polsley* were husband and wife attorneys. *Id.* at 882. The wife had been appointed trustee of her dying mother's trust account which then received social security survivor benefits. *Id.* at 882. After the mother died, the Social Security Administration mistakenly continued to deposit payments into the account, and the couple converted these funds for their own use. *Id.* Consequently, both Polsleys ended up pleading guilty in federal court to "knowingly and willfully convert[ing] government property." *Id.* at 884. We revoked both of their licenses. *Id.* at 886.

We think *Polsley* is distinguishable for largely the same reason as *Nelsen*. Bieber did not convert funds himself or knowingly assist a client in doing so. Rather, he made a misrepresentation in the real estate sales paperwork that fraudulently induced Interbay Funding to enter into a loan agreement with the buyers. While this conduct is reprehensible, we do not think it is the same as outright theft of another person's money.

In *Iowa Supreme Court Attorney Disciplinary Board v. Carroll*, we also revoked an attorney's license. 721 N.W.2d 788, 789 (Iowa 2006). There the attorney, as chairperson of a nonprofit organization, had misappropriated funds for personal use and eventually pled guilty to second-degree theft. *Id.* at 789–90.

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Williams*, we revoked the license of an attorney who pled guilty to "interstate transportation of stolen property and wire fraud." 675 N.W.2d 530, 531 (Iowa 2004). The convictions were based on the attorney's embezzlement from two different companies that employed her. *Id.* at 531–32. As a head of the claims department of a trucking company, she

fraudulently obtained $692,540.22 by "submitting fictitious accident claims to her employer" and diverting the checks to her personal bank account. *Id.* at 531. She also defrauded an insurance company that employed her of $386,713.78 by authorizing the payment of claims to a fictitious claimant which was one of her several aliases. *Id.* at 532.

Again, we find these theft and conversion cases distinguishable from the present case where the attorney received his normal closing fee to knowingly abet a fraudulent transaction but was not aware that funds were being converted. Our cases are legion that thefts of funds, particularly when the attorney has been criminally convicted for the underlying conduct, will normally result in revocation. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wengert*, 790 N.W.2d 94, 103–04 (Iowa 2010) (revoking law license for two instances of misappropriating client funds); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 774 N.W.2d 301, 308–09 (Iowa 2009) (revoking license for misappropriating client funds); *Williams*, 675 N.W.2d 530, 532–33 (Iowa 2004) (revoking the license of an attorney who defrauded two separate employers in excess of $1 million for personal use, pled guilty to one count of interstate transportation of stolen property and one count of wire fraud, and was sentenced to thirty months in federal prison); *Lett*, 674 N.W.2d 139, 140–143 (revoking license of an attorney who gambled away $13,300 stolen from a client, stole $5000 from another client for her own burial expenses, and consequently pled guilty to second-degree theft); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Vinyard*, 656 N.W.2d 127, 128–29, 131–32 (Iowa 2003) (revoking the law license of an attorney who was convicted of several counts of mail fraud and money laundering over a fraudulent scheme where the attorney and his brother overcharged the brother's employer and kept the money for themselves);

*Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lyzenga*, 619 N.W.2d 327, 328 (Iowa 2000) (revoking the license of an attorney who had fourteen convictions for theft, prostitution, trespass, forgery, and deceptive practices, when much of the underlying conduct involving the writing of bad or unauthorized checks and shoplifting); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Schatz,* 595 N.W.2d 794, 795–96 (Iowa 1999) (revoking the license of an attorney who pled guilty to theft and income tax evasion after converting over $140,000 in legal fees after a period of many years); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Palmer,* 563 N.W.2d 634, 634–35 (Iowa 1997) (revoking the license of an attorney who pled guilty to a felony after stealing two credit cards and using them to obtain funds for his own purposes).

Yet when the criminal conviction involves fraudulent conduct without theft or conversion, lesser sanctions have at times been imposed. For example, in *Romeo*, we suspended an attorney's license for three years after the attorney falsified receipts to protect a client who was under criminal suspicion. 554 N.W.2d at 553–55. The attorney had only been convicted of a misdemeanor, but we accepted the jury's finding that "Romeo knowingly engaged in false and deceitful conduct." *Id.* at 554. Additionally, Romeo did not "reach this court with a sterling record," because he had a previous public reprimand for sending a letter that threatened criminal charges solely to obtain an advantage in a civil matter, and a prior conviction for simple misdemeanor theft. *Id.*

A closer analogy to the present case may be found in the *Gallner* disciplinary proceeding. 621 N.W.2d at 183. In *Gallner,* we suspended an attorney for six months for overstating the attorney fees he had charged his clients for handling workers' compensation cases in letters to the Social Security Administration. 621 N.W.2d at 185. "By reporting

exaggerated attorney fees to the Social Security Administration, [the attorney] enabled some of his clients to receive more social security disability benefits than they would have been entitled to under the law." *Id.* In settling on a six-month suspension, we noted that the attorney had a prior disciplinary record. *Id.* at 188. *Gallner* is instructive here because it involved an attorney who made affirmative written misrepresentations in the course of a representation that enabled a party to receive more funds than the party was entitled to. However, unlike in the case at hand, the attorney in *Gallner* was not convicted of a crime.[8]

There is also some similarity between Bieber's misconduct and a criminal conviction for failing to file tax returns. The latter cases, we have said, involve " 'cheat[ing] the government.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Knopf*, 793 N.W.2d 525, 531 (Iowa 2011) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Iversen*, 723 N.W.2d 806, 810 (Iowa 2006)). In *Knopf*, we reviewed the varying levels of discipline meted out by this court when attorneys failed to file tax returns. *Id.* We have "imposed a sanction of license suspension from sixty days to three years" in such cases. *Id.* For example, in *Knopf* we suspended the attorney for three months after he had been convicted of two counts of fraudulent practices for failing to file state income tax returns. *Id.* at 528–31. We acknowledged that illness can be a mitigating factor and noted the parties' stipulation to additional mitigating factors including lack of a

---

[8]It should be noted, though, that Bieber understood the excess funds provided by the lender would be spent on repairs to improve the property in which the lender had a security interest. In *Gallner*, by contrast, the federal government was being induced into making overpayments with no benefit in return. *See also Comm. on Prof'l Ethics & Conduct v. Bauerle*, 460 N.W.2d 452, 454 (Iowa 1990) (imposing a six-month suspension on an attorney who backdated various documents and performed a false notarization to enable a client to obtain financial gain).

disciplinary history, cooperation with the Board, and the winding down of the attorney's practice. *Id.* at 531–32.

In *Schall*, we imposed a six-month suspension. 814 N.W.2d at 215. In addition to his conviction on three counts of third-degree fraudulent practice for failure to file tax returns, the attorney substantially underreported his income for several years after his failure to file the returns was discovered. *Id.* at 212. We determined the attorney violated rule 32:8.4(c) by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. *Id.* at 213–14.

In *Fields*, a tax evasion case in which we imposed an eighteen-month suspension, the attorney was also found to have engaged in a variety of other serious misconduct including neglect of two client matters. 790 N.W.2d at 793.

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Neuwoehner*, we imposed a ninety-day suspension upon an attorney who had been convicted of third-degree fraudulent practices for failure to file state income tax returns, while noting that "a lawyer's failure to file income tax returns misrepresents that lawyer's income." 595 N.W.2d 797, 798 (Iowa 1999).[9]

Admittedly, a difference between this case and the failure to file income tax return cases is that the deceptive acts in this case were committed in the course of the attorney's representation of a client. On the other hand, when an attorney fails to report income to the

---

[9]In *Vinyard*, we said, "Where felony convictions have directly involved dishonest conduct, we have revoked the attorney's license to practice law." 656 N.W.2d at 132. That is a true statement. Yet as the foregoing summary indicates, we have not *automatically* revoked the license of an attorney who is convicted of conduct involving fraud. An important consideration, as we discuss above, is whether the fraud included a theft or conversion of funds.

government, he or she is deriving a direct personal benefit from the fraud, a circumstance not present here.

In *Committee on Professional Ethics & Conduct v. Littlefield*, we revoked the license of an attorney who had been convicted in Kentucky of attempting to commit a felony by making a false statement to procure a credit card. 244 N.W.2d 824, 825–26 (Iowa 1976). While that case did not involve a completed theft, the fraud was for the attorney's personal benefit. *Id.* at 825. Moreover, we emphasized that the attorney had "determined to evade the restrictions of his probation and willfully disobeyed the order" of the Kentucky court that he not practice law during his probation by removing himself to Iowa and resuming the practice of law. *Id.* at 825–26. As to the latter conduct, we concluded:

> His dishonest and deceitful conduct in these regards demonstrates his lack of the requisite good moral character required of an individual before he is permitted to engage in the practice of law in this state, and his actions permit of no other sanction than the immediate and permanent revocation of his license to practice the profession of law in Iowa.

*Id.* at 826. Thus, the revocation in *Littlefield* appears to have been based in large part on the attorney's willful evasion of the terms of his court-imposed probation. Notably, we cited *Littlefield* with approval in a subsequent case where we imposed a ninety-day suspension on an attorney who had engaged in fraudulent conduct but was unable to complete his intended conversion of funds. *See Comm. on Prof'l Ethics & Conduct v. Millen*, 357 N.W.2d 313, 314–15 (Iowa 1984). In that case, the attorney had been ordered during his pending divorce proceeding not to withdraw any funds from a specific account without the written approval of his wife. *Id.* at 314. In violation of that order, the attorney had drafted checks worth over $26,000 payable to himself and forged his

wife's signature to those checks. *Id.* He was unsuccessful only because the wife's attorney learned of the checks and contacted the payor institution in time. *Id.*

Courts in other jurisdictions have considered the appropriate sanction for an attorney convicted of misprision of a felony and reached varying conclusions, depending on the situation. *See Att'y Grievance Comm'n of Md. v. Wingerter*, 929 A.2d 47, 57–58, 60 (Md. 2007) (disbarring attorney who pled guilty to misprision of a felony after acknowledging that he was aware of the existence of a conspiracy to engage in immigration fraud and affirmatively acted to conceal such activity); *In re Calonge*, 859 N.Y.S.2d 536, 536–37 (App. Div. 2008) (suspending lawyer for two years subsequent to conviction of misprision of a felony for "mail[ing] a letter to the United States Citizenship and Immigration Services for the purpose of concealing a fraudulent certification of employment"); *State ex rel. Okla. Bar Ass'n v. Golden*, 201 P.3d 862, 863–64, 866 (Okla. 2008) (disbarring attorney whose involvement in health care fraud cover-up led to conviction of misprision of a felony for which he was sentenced to three years probation and ordered to pay $5,719,340.22 in restitution).

In *In re Russell*, a New York appellate court considered the case of an attorney who pled guilty to misprision of a felony and was sentenced

> to a term of probation of one year, confined to his home with electronic monitoring for a period of six months, ordered to pay a fine in the sum of $25,000 and a special assessment in the sum of $100, directed to perform 20 hours per week of community service while on probation, and ordered to participate in a mental health treatment program.

877 N.Y.S.2d 364, 365 (App. Div. 2009). The court held that a six-month suspension was an appropriate sanction in light of the attorney's lack of a disciplinary record in New York, acknowledgement of his misconduct,

expression of remorse, cooperation with the grievance committee, "strict adherence to the terms of his suspension and federal probation, his meticulous record keeping, and the fact that he ha[d] been automatically reinstated in the State of Connecticut upon the expiration of his federal probation." *Id.*

In an Arizona case, an attorney pled guilty to misprision of a felony after being named as a defendant in a federal indictment alleging conspiracy to defraud the United States in relation to a former client's tax evasion scheme. *In re Morris*, 793 P.2d 544, 545 (Ariz. 1990). The Supreme Court of Arizona suspended the attorney for six months pursuant to an Arizona disciplinary rule that required the suspension of any attorney convicted of a felony. *Id.* at 546–47. The mitigating factors in that case were that the attorney had been a member of the bar for over twenty years, he had no prior disciplinary record, and there was no evidence of a "dishonest or selfish motive or desire for pecuniary gain." *Id.* at 547.

In *State ex rel. Counsel for Discipline v. Boose*, the Supreme Court of Nebraska held that disbarment was the appropriate sanction for an attorney in a reciprocal disciplinary proceeding. 759 N.W.2d 110, 113 (Neb. 2009). The attorney failed to report that his client, a county commissioner, was engaging in illegal self-dealing in a public real estate transaction. *Id.* at 112. The attorney had pled guilty to misprision of a felony and had been suspended for three years by the Florida Supreme Court. *Id.* at 112–13.

We agree with the commission that Bieber's lack of a prior disciplinary record is an important mitigating factor. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lustgraaf*, 792 N.W.2d 295, 301–02 (Iowa 2010) (noting the lack of a prior record of discipline as a mitigating

factor); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Howe*, 706 N.W.2d 360, 379 (Iowa 2005) (same). An additional mitigating factor is Bieber's record of community service. *See Schall*, 814 N.W.2d at 215 (recognizing voluntary community service as a mitigating factor); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Boles*, 808 N.W.2d 431, 442 (Iowa 2012) (same). Also, Bieber acknowledged wrongdoing and expressed remorse for his actions. He has paid the entire restitution. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Taylor*, 814 N.W.2d 259, 268 (Iowa 2012) (finding that taking responsibility for one's actions is a mitigating factor); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Tofflemire*, 689 N.W.2d 83, 93 (Iowa 2004) ("A mitigating factor is the attorney's recognition of some wrongdoing."). And Bieber has cooperated fully with the Board and the commission. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Denton*, 814 N.W.2d 548, 551 (Iowa 2012) (noting cooperation as a mitigating circumstance). A further mitigating factor is that Bieber is well respected in his legal community, as several character witnesses attested. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Iversen*, 723 N.W.2d 806, 811 (Iowa 2006) (noting that "we do not overlook an attorney's devoted service to the profession" (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics and Conduct v. Frerichs*, 671 N.W.2d 470, 478 (Iowa 2003))). Lastly, we are persuaded that Bieber's misconduct was not motivated by a desire for financial gain. *See Howe*, 706 N.W.2d at 380 (noting as a mitigating factor that the attorney did not intend to obtain any personal financial benefit). Bieber only stood to receive the standard $400 fee he charged for any real estate closing.[10]

---

[10]The Board did not treat Bieber's recent illness as a mitigating factor. We follow the same approach. While we certainly sympathize with Bieber's present medical situation, for mitigation purposes we generally focus on whether the attorney was

Yet the fact remains that Bieber was involved in a criminal fraud as part of his law practice, albeit one that did not involve—as far as he knew—a theft or conversion of funds. Although Bieber has demonstrated that he and his client operated under a reasonable belief that Hanneken and Herdrich were going to use the additional loan proceeds to improve the property, rather than abscond with them, Bieber correctly acknowledges that "if somebody hadn't done the part of it that I did, they wouldn't have been able to pull it off." This serious violation of our ethical standards warrants a significant sanction.

**V. Disposition.**

In light of all of the facts and circumstances in this case, and after careful consideration of the goals of our ethical rules, mitigating and aggravating factors, our precedents, and cases from other jurisdictions, we suspend Bieber's license to practice law in this state indefinitely with no possibility of reinstatement for six months. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 35.12(3). Bieber must comply with Iowa Court Rule 35.22 dealing with the notification of clients and counsel.

Upon application for reinstatement, Bieber must establish that he has not practiced law during the suspension period and that he has complied with the requirements of Iowa Court Rules 35.13 and 35.22. The costs of this action are taxed to Bieber pursuant to Iowa Court Rule 35.26(1).

**LICENSE SUSPENDED.**

All justices concur except Waterman and Zager, JJ., who concur specially, and Wiggins, J., who dissents.

---

suffering from a health condition when the misconduct occurred. *See Schall*, 814 N.W.2d at 215.

**WATERMAN, J. (concurring specially).**

I join in the well-reasoned majority opinion, but write separately to respond to the dissent by Justice Wiggins. The dissent accuses Bieber of stealing and calls for the permanent revocation of his law license. The dissent's accusation is inaccurate, and the dissent's punishment does not fit the crime. Bieber did not steal a dime. Nor did he know other parties to the real estate transaction ultimately would default on the bank loan. Bieber collected only a standard $400 fee and, later, personally paid the entire $37,969 restitution to make the bank whole. Before this case, he had an unblemished record, excellent reputation, and history of giving back to his community with voluntary service. The Attorney Disciplinary Board, acting as prosecutor, never sought revocation and concurred in the six-month suspension recommended by the grievance commission panel that conducted the evidentiary hearing. The revocation cases cited by the dissent involved far more egregious misconduct.

The majority opinion does what our court strives to do in all lawyer discipline cases: carefully reviews the evidence, the applicable rules, the mitigating and aggravating circumstances, and precedent to determine the appropriate sanction. One size does not fit all. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cannon*, 821 N.W.2d 873, 880 (Iowa 2012) ("There is no standard sanction warranted by any particular type of misconduct. Though prior cases can be instructive, the sanction warranted in a particular case must be based on the circumstances of that case." (Citation omitted.)). The dissent's call for revocation on this record is at odds with our court's precedent. Notably, Justice Wiggins's dissent fails to cite the decision he authored in *Iowa Supreme Court*

*Attorney Disciplinary Board v. Iversen*, 723 N.W.2d 806, 810–12 (Iowa 2006). In that case, our court suspended for one year the license of an attorney guilty of tax fraud. *Iversen*, 723 N.W.2d at 811–12. Iversen cheated our state government out of $207,743—money he pocketed illegally. *Id.* at 808. Iversen also failed to file a federal tax return for ten years, allowing him to illegally retain $180,000 to $200,000 in taxes that he owed the federal government. *Id.* Iversen's revocation clearly would be required under the definition of stealing in today's dissent. Justice Wiggins wrote in that case, " 'It is as wrong for a lawyer to cheat the government as it is for him to cheat a client.' " *Id.* at 810 (quoting *Comm. on Prof'l Ethics & Conduct v. Strack*, 225 N.W.2d 905, 905 (Iowa 1975)). But, he also stated, "[W]e adapt sanctions to the unique facts of each case." *Id.* That is what he fails to do today.

The dissent gets the facts wrong, and then misapplies our precedent. The dissent argues Bieber *knowingly* "assisted a client in stealing money from the bank." First, the record evidence confirms Bieber did not know anyone in the transaction would steal or fail to repay the bank loan. He believed the borrowers would spend the additional loan proceeds to fix up the property that secured the loan. He assumed the bank would be repaid. Bieber was not charged with theft, nor could he have been charged with theft absent intent to deprive another of property. *See* Iowa Code § 714.1(1) (2005).

Second, Bieber's client was Wood, the seller. Bieber did not represent Hanneken or Herdrich, the buyers who later "stole" from the bank by defaulting on the loan they obtained. Bieber, to his shame and regret, enabled them by falsifying the documents to show an inflated sale price in a single transaction before the real estate market crashed. His misconduct warrants the six-month suspension our court imposes today,

as recommended by the disciplinary board and grievance commission. But, the dissent is wrong to equate Bieber's conduct to the "conduct that prompted us to revoke the law licenses" of the attorneys in four other cases: *Iowa Supreme Court Attorney Disciplinary Board v. Nelsen*, 807 N.W.2d 259, 267–68 (Iowa 2011); *Iowa Supreme Court Board of Professional Ethics & Conduct v. Vinyard*, 656 N.W.2d 127, 132 (Iowa 2003); *Committee on Professional Ethics & Conduct v. Hall*, 463 N.W.2d 30, 35–36 (Iowa 1990); and *Committee on Professional Ethics & Conduct v. Littlefield*, 244 N.W.2d 824, 825–26 (Iowa 1976).

The majority opinion correctly distinguishes *Nelsen* and *Vinyard.* In *Nelsen*, the attorney violated court orders by diverting at least $141,335 of receivables to his clients and thereby knowingly aided and abetted their conversion of bank funds. 807 N.W.2d at 261, 267. In *Vinyard*, the attorney was convicted of fourteen counts of mail fraud and twelve counts of money laundering. 656 N.W.2d at 128. The victims' loss exceeded $2.8 million. *Id.* at 131. We noted Vinyard "engaged in a lengthy pattern of misconduct . . . all for the sake of personal, pecuniary gain." *Id.* at 132. By contrast, Bieber's discipline involves a single transaction in which he merely collected a $400 fee. He was not breaking the rules for personal gain, and he made the victim bank whole by paying the restitution of $37,969.

*Hall* likewise involved aggravating circumstances not present here. In that case, the lawyer entered into a series of business transactions with his client over a four-year period despite their conflicting interests and the absence of disclosure and consent. *Hall*, 463 N.W.2d at 33–35. Some of the transactions were for the lawyer's benefit alone, and most were disastrous for the client, who lost several hundred thousand dollars. *Id.* at 35–36. Hall lied to obtain a $350,000 bank loan and

"later gave false testimony in a sworn deposition regarding the incident, and also when he made false representations to the Committee on Professional Ethics and Conduct." *Id.* at 35. Hall also had been reprimanded for misconduct with another client three years earlier. *Id.* at 36. By contrast, Bieber had a clean record, and his misconduct did not harm his client. He cooperated throughout the disciplinary proceedings and testified truthfully.

*Littlefield* is no closer to the mark. Littlefield was sentenced to incarceration for one year in a Kentucky county jail for bank fraud and then violated the terms of his probation by foregoing court-ordered psychiatric treatment and fleeing to Iowa to practice law in willful disobedience of the Kentucky court order. *Littlefield,* 244 N.W.2d at 825–26. By contrast, Bieber honored the terms of his probation, complied with court orders, and expressed appropriate remorse and contrition.

None of the other revocation cases relied on by the dissent is on point here. Moreover, the dissent's discussion of revocation cases from other jurisdictions fails to mention that in most of those states, revocation can be temporary, with readmission permitted. *See* James R. Zazzali, *The Whys and Hows of Permanent Disbarment: New Jersey's* Wilson *Rule*, 21 Geo. J. Legal Ethics 311, 337 n.224 (2008) (listing Iowa as one of approximately six states where license revocation is permanent). Similarly, the dissent relies on the ABA standards without noting disbarment may only be temporary. *See* ABA Model Rules for Lawyer Disciplinary Enforcement R. 25 (2002) (permitting and setting forth the criteria for readmission after disbarment). By contrast, revocation of an Iowa law license is permanent.

I agree revocation is appropriate when a lawyer steals or helps another person the lawyer knows is stealing. That is not what Bieber

did. His six-month suspension fits the crime and matches the six-month suspension today for comparable misconduct in *Iowa Supreme Court Disciplinary Board v. Wheeler*, 824 N.W.2d 505 (Iowa 2012).

Zager, J., joins this special concurrence.

#12–1203, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bieber*

**WIGGINS, Justice (dissenting).**

It is almost axiomatic that we revoke the license of a lawyer who steals. *Comm. on Prof'l Ethics & Conduct v. Ottesen*, 525 N.W.2d 865, 866 (Iowa 1994). There is no place in our profession for an attorney who steals funds from another. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Bell*, 650 N.W.2d 648, 652 (Iowa 2002). Dishonesty is a trait that disqualifies a person from the practice of law. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Irwin*, 679 N.W.2d 641, 644 (Iowa 2004).

We have an obligation to protect the public from theft and deceit. *Bell*, 650 N.W.2d at 652. When a theft occurs, we need not address other disciplinary violations to revoke an attorney's license. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Adams*, 809 N.W.2d 543, 546 (Iowa 2012); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 774 N.W.2d 301, 309 (Iowa 2009). We do not diminish the seriousness of the violation for stealing funds where the attorney's misappropriation does not involve client funds. *Bell*, 650 N.W.2d at 652. The amount of money converted by the attorney also does not lessen the discipline. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Anderson*, 687 N.W.2d 587, 590 (Iowa 2004). Neither does it matter that the attorney replaced the funds. *Comm. on Prof'l Ethics & Conduct v. Pappas*, 313 N.W.2d 532, 533–34 (Iowa 1981).

We have done a decent job applying these principles when disciplining attorneys involved in thefts. We revoked the license of attorneys who misappropriated funds from their clients. *See, e.g., Adams*, 809 N.W.2d at 546; *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wengert*, 790 N.W.2d 94, 104 (Iowa 2010); *Earley*, 774 N.W.2d at 309; *Iowa Supreme Ct. Att'y Disciplinary Bd. v. D'Angelo*, 710 N.W.2d 226, 236–37 (Iowa 2006); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Reilly*, 708

N.W.2d 82, 85 (Iowa 2006); *Anderson,* 687 N.W.2d at 590; *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett,* 674 N.W.2d 139, 144–45 (Iowa 2004); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Leon,* 602 N.W.2d 336, 339 (Iowa 1999). We revoked the license of an attorney when he knowingly assisted a client defraud a bank. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelsen,* 807 N.W.2d 259, 267–68 (Iowa 2011). We revoked the license of an attorney who personally defrauded a bank with a false loan application. *Comm. on Prof'l Ethics & Conduct v. Hall,* 463 N.W.2d 30, 35–36 (Iowa 1990). We revoked the license of an attorney who gave false information to a bank to obtain a credit card. *Comm. on Prof'l Ethics & Conduct v. Littlefield,* 244 N.W.2d 824, 826 (Iowa 1976). We revoked the license of an attorney who stole money from his law firm. *Irwin,* 679 N.W.2d at 644–45; *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Carr,* 588 N.W.2d 127, 129–30 (Iowa 1999); *Comm. on Prof'l Ethics & Conduct v. Hanson,* 244 N.W.2d 822, 824 (Iowa 1976). We revoked a lawyer's license for stealing two credit cards and using them without the owner's authorization. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Palmer,* 563 N.W.2d 634, 634–35 (Iowa 1997). We revoked a lawyer's license for stealing from her employer. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Williams,* 675 N.W.2d 530, 533 (Iowa 2004). We revoked the license of a lawyer who helped his brother in a scheme to defraud his brother's employer. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Vinyard,* 656 N.W.2d 127, 132 (Iowa 2003). We revoked the license of an attorney for stealing money from a nonprofit association. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Carroll,* 721 N.W.2d 788, 791–92 (Iowa 2006). We revoked the licenses of husband-and-wife attorneys for converting social security benefits erroneously paid to the deceased mother of one of the attorneys. *Iowa Supreme Ct.*

*Att'y Disciplinary Bd. v. Polsley*, 796 N.W.2d 881, 886 (Iowa 2011). We revoked the licenses of attorneys who commingled trust account funds with their own monies. *Comm. on Prof'l Ethics & Conduct v. Shaffer*, 230 N.W.2d 1, 2–3 (Iowa 1975); *Comm. on Prof'l Ethics & Conduct v. Rowe*, 225 N.W.2d 103, 103–04 (Iowa 1975). The common thread running through these license revocations is that the attorney did not have the requisite character to practice law.

The facts in this case are undisputed. Bieber knowingly made a false statement to the bank to assist his client in obtaining funds the client would not otherwise be entitled to receive. In other words, Bieber knowingly assisted his client in misappropriating money from the bank. We revoked the law licenses of three other attorneys in three separate matters for similar conduct. *Nelsen*, 807 N.W.2d at 267–68; *Vinyard*, 656 N.W.2d at 132; *Hall*, 463 N.W.2d at 35–36.

The majority avoids revoking Bieber's license by suggesting this is not a real theft.[11] This characterization is akin to putting lipstick on a pig. The truth to this colloquialism is apparent: no matter how much lipstick you apply, it is still a pig. Accordingly, no matter how the majority characterizes Bieber's conduct, he still assisted a client in stealing money from the bank. Stealing is stealing.

On top of that, his conduct earned him the distinction of becoming a convicted felon. Other jurisdictions have no hesitation in revoking an attorney's license when he or she participates in defrauding a bank and

---

[11]The majority relies on our decision in *Iowa Supreme Court Board of Professional Ethics & Conduct v. Gallner*, 621 N.W.2d 183 (Iowa 2001), to characterize Bieber's conduct as a misrepresentation. We analyzed Gallner's conduct as a misrepresentation he made to the Social Security Administration and not as a theft. *Gallner*, 621 N.W.2d at 187. Moreover, Gallner was not a convicted felon. Had we analyzed Gallner's conduct as a theft, I believe the outcome would have been different.

is subsequently convicted of a felony. At least twenty-one other states will revoke the license of or disbar an attorney for similar conduct.[12] My

[12]*See, e.g.*, *Cambiano v. Ligon*, 44 S.W.3d 719, 720–21 (Ark. 2001) (disbarring attorney convicted of aiding and abetting the causing of a financial institution to file a false currency-transaction report); *People v. Hilgendorf*, 895 P.2d 544, 544–45 (Colo. 1995) (disbarring attorney with a federal conviction for two counts of bank fraud); *In re Brewster*, 587 A.2d 1067, 1067 (Del. 1991) (disbarring attorney who pleaded guilty to one count of bank fraud); *In re Lickstein*, 972 A.2d 314, 316 (D.C. 2009) (disbarring attorney convicted of conspiring to commit felony bank fraud through a scheme involving mortgage financing); *Florida Bar v. Forbes*, 596 So. 2d 1051, 1051–53 (Fla. 1992) (ordering disbarment retroactively to the date of the felony suspension for attorney who pleaded guilty to making false statements in financial documents); *In re Brannon*, 291 S.E.2d 523, 523–24 (Ga. 1982) (accepting attorney's voluntary surrender of license to practice law after attorney pleaded guilty to making a materially false statement to a bank); *In re Dickson*, 824 P.2d 197, 197–98 (Kan. 1992) (disbarring attorney who made false statements to a bank); *Ky. Bar Ass'n v. Matthews*, 131 S.W.3d 744, 744–45 (Ky. 2004) (disbarring attorney convicted of seven counts of defrauding financial institutions); *In re Schneider*, 707 So. 2d 38, 39–40 (La. 1998) (disbarring attorney with convictions including mail fraud, conspiracy to commit mail fraud, and intentionally submitting false statements to a financial institution); *In re Kennedy*, 697 N.E.2d 538, 541 (Mass. 1998) (disbarring attorney who pleaded guilty to eleven counts of making false statements to a lender, mail fraud, and wire fraud); *In re Discipline of Peterson*, 110 N.W.2d 9, 12–14 (Minn. 1961) (disbarring attorney for submitting false statements to a bank); *Miss. Bar v. Castle*, 38 So. 3d 632, 633–34 (Miss. 2010) (disbarring attorney for her involvement in a mortgage fraud operation, which resulted in her convictions for crimes including conspiracy to defraud a bank and money laundering); *In re Ellis*, 28 A.3d 1241, 1241 (N.J. 2011) (disbarring attorney who pleaded guilty to bank fraud and conspiracy to commit bank fraud); *In re Powder*, 826 N.Y.S.2d 82, 82–83 (App. Div. 2006) (disbarring attorney convicted of defrauding a bank after he submitted escrow letters containing false statements in order to obtain loan proceeds); *Office of Disciplinary Counsel v. Lowe*, 662 N.E.2d 796, 796–97 (Ohio 1996) (disbarring attorney convicted of using a false social security number in financial transactions, making false representations in a loan application, defrauding a bank, and transporting interstate fraudulent securities); *State ex rel. Okla. Bar Ass'n v. Hobbs*, 848 P.2d 551, 551–52 (Okla. 1993) (disbarring attorney who pleaded guilty to bank fraud, money laundering, and embezzlement); *In re Conduct of Griffith*, 748 P.2d 86, 125 (Or. 1987) (disbarring attorney who participated in sham transaction with his partner to circumvent federal banking laws and misrepresented his net worth to a bank); *In re Concemi*, 706 A.2d 1318, 1318–19 (R.I. 1998) (disbarring attorney convicted of thirty-five felony charges, including conspiracy to defraud a bank, bank fraud, and making false statements to a bank); *In re Walters*, 735 S.E.2d 635, 636–37 (S.C. 2011) (disbarring attorney who pleaded guilty to misprision of felony, bank fraud, and making false statements to a lending institution); *In re Holt*, 492 S.E.2d 793, 793 (S.C. 1997) (disbarring attorney after he pleaded guilty to one count of bank fraud); *In re Looby*, 297 N.W.2d 487, 489 (S.D. 1980) (disbarring attorney convicted of making false statements to a financial institution); *Searcy v. State Bar of Texas*, 604 S.W.2d 256, 260 (Tex. 1980) (disbarring attorney convicted of making false statements to a bank in a loan application).

position is also consistent with the ABA Standards for Imposing Lawyer Sanctions. The ABA Standards provide:

> Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation:
>
> > 5.11 Disbarment is generally appropriate when:
> >
> > > (a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or
> > >
> > > (b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

ABA Standards for Imposing Lawyer Sanctions §§ 5.1, 5.11 (1992).

We also have revoked the license of an attorney for substantially similar conduct. *Littlefield,* 244 N.W.2d at 826. In *Littlefield,* a court convicted Littlefield of the crime of attempting to commit a felony, which is a misdemeanor under the laws of Kentucky. *Id.* at 825. The underlying facts of the crime were that Littlefield made a false statement regarding his financial condition to a bank in order to procure a credit card. *Id.* Based on that misrepresentation, we found

> [h]is dishonest and deceitful conduct in these regards demonstrates his lack of the requisite good moral character required of an individual before he is permitted to engage in the practice of law in this state, and his actions permit of no other sanction than the immediate and permanent revocation of his license to practice the profession of law in Iowa.

*Id.* at 826.

Had Bieber been convicted of this felony before he became a lawyer, I doubt we would have allowed him to sit for the bar exam. *See* Iowa Code § 602.10102 (2011) ("Every applicant for such admission shall be a person of honesty, integrity, trustworthiness, truthfulness and one who appreciates and will adhere to a code of conduct for lawyers as adopted by the supreme court."); Iowa Ct. R. 31.9(1) (requiring all persons who apply for admission to the Iowa bar to have the requisite moral character or fitness). The same test should apply to attorneys who steal money or help others do so after they are licensed.

Ever since my appointment to the court, I have been troubled by the court picking and choosing the types of fraud and stealing that will result in the revocation or suspension of an attorney's license. I initially went along with this practice, because I felt it was important for the court to speak with one voice when meting out attorney discipline.

In recent years, however, I have seen more and more attorneys taking property from clients or knowingly aiding and abetting a client in stealing property from others. Yet I held out hope that we would abandon this inconsistent practice when we decided *Nelsen.* 807 N.W.2d at 266–68. There, we revoked the license of an attorney who knowingly aided and abetted his client in defrauding a bank of funds, even though the attorney had no criminal conviction for his misconduct. *Id.*

Here, we have an attorney who knowingly helped his client obtain funds from the bank. This constitutes the exact same conduct as in *Nelsen,* but the case for Bieber's license revocation is stronger. Bieber pled guilty to this misconduct and has a felony conviction. Despite this, the members of the court, once again, pick from their palate a rosier hue

of stealing and choose to impose a discipline inconsistent with our precedent. For this reason, I can no longer remain silent.[13]

It is the court's obligation to protect the public from attorneys who are unfit to practice law. Bieber's law license gave him the privilege of assisting clients with their legal matters—it did not pave the way for him to aid a client in defrauding a bank and committing a felony. By choosing to undertake these actions, Mr. Bieber has forfeited his privilege to practice law in this state.

We, as a court and as the regulatory body for our profession, have an obligation to protect the public from dishonest attorneys. I echo the beginning of this dissent—*dishonesty is a trait that disqualifies a person from the practice of law.* A person who uses his law license to steal money or aids another to do so is per se unfit to practice law. Cases like this give the public the perception that a license to practice law is a license to steal. I have no hesitation in revoking Bieber's license.

---

[13]This is not the first time a member of this court has written separately in a discipline case. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Marcucci,* 543 N.W.2d 879, 884 (Iowa 1996) (Neuman, J., dissenting).